Ralph J. TAUSSIG and Sally G. Taussig, his wife, as Tenants by the Entireties, Plaintiffs,

v.

WELLINGTON FUND, INC., a Delaware corporation; Wellington Equity Fund, Inc., a Delaware corporation; The Wellington Company, a Delaware corporation; and Wellington Company, Ltd., a Delaware corporation, Defendants.

Civ. A. No. 2047.

United States District Court
D. Delaware.
Aug. 11, 1960.

William E. Taylor, Jr., Wilmington, Del., Edwin P. Rome and Morris L. Weisberg of Blank, Rudenko, Klaus & Rome, Philadelphia, Pa., Floyd H. Crews and Harvey W. Mortimer of Darby & Darby, New York City, of counsel, for plaintiffs.

Richard F. Corroon of Berl, Potter & Anderson, Wilmington, Del., Henry N. Paul, Jr., of Paul & Paul, Philadelphia, Pa., and Daniel Mungall, Jr., of Stradley, Ronon, Stevens & Young, Philadelphia, Pa., of counsel, for defendants.

CALEB M. WRIGHT, Chief Judge.

In this declaratory judgment action filed pursuant to 28 U.S.C. § 2201 certain minority shareholders of Wellington Fund, Inc., seek a determination of the ownership of the name "Wellington" in the investment company industry.[1]

The following Stipulation of Facts has been entered of record: [2]

1. Plaintiffs are citizens of the Commonwealth of Pennsylvania. All of the defendants are corporations incorporated under the laws of the State of Delaware. The amount in controversy exceeds, exclusive of interest and costs, the sum of $10,000.

2. Plaintiffs are now and were at the time of the transactions herein complained of stockholders of defendant Wellington Fund, Inc., holding 211.482 shares of common stock, par value $1 per share.

3. Plaintiffs bring this action in the attempt to enforce secondary rights claimed to be held by themselves and all other stockholders similarly situated in Wellington Fund, Inc., and assertedly on behalf of Wellington Fund, Inc. for the benefit of Wellington Fund, Inc., because Wellington Fund, Inc., refused after demand to enforce alleged rights which should, plaintiffs claim, properly be asserted by it.

4. This action is not a collusive one to confer on a Court of the United States jurisdiction of a cause of which it would not otherwise have cognizance.

5. Defendant Wellington Fund, Inc. (hereinafter called "Wellington Fund") is an open-end, diversified management investment company incorporated on December 26, 1928, which is registered under the Investment Company Act of 1940, which at September 1, 1958, had an authorized capitalization of 100,000,-000 shares $1 par value common stock with equal voting rights and no preferences as to conversion, exchange, dividends, retirement, or any other feature; and had at September 1, 1958, 57,706,-791 shares outstanding of a net asset value of $750,709,451 with approximately 248,000 shareholders located in every state of the United States and in many parts of the world. No shareholder owns beneficially as much as 5 per cent of the outstanding shares. Wellington Fund's objectives are conservation of principal, reasonable income return, and profits without undue risk with fundamental investment policies to achieve these objectives of careful selection of individual securities, continuous conservative management supervision, and balanced investing in bonds, preferred and common stocks of many separate companies in different industries. At December 31, 1958, Wellington Fund had 262,000 shareholders and net assets of $857,964,-256.

When originally incorporated this company was called Industrial and Power Securities Co. but by amendment to its Certificate of Incorporation filed July 11, 1935, changed its name to Wellington Fund, Inc.

6. Defendant The Wellington Company (hereinafter called "Wellington Company") is a corporation incorporated on January 21, 1931, which acts as both investment adviser and, up to the date of the complaint in this case, principal underwriter of Wellington Fund only. When originally incorporated this com-

---

1. Defendants do not dispute that derivative claims may be asserted in a declaratory judgment action. See Motor Terminals v. National Car Co., D.C.Del. 1949, 92 F.Supp. 155, 161.

2. N.T. 13–28; Docket No. 13.

pany was called W. L. Morgan & Co. but by Amendment to its Certificate of Incorporation filed April 10, 1952, it changed its name to The Wellington Company.

On April 12, 1952, Wellington Company entered into a management and investment advisory agreement with Wellington Fund, under which Wellington Company has furnished Wellington Fund with statistical research, analytical and general management services, including research and administrative personnel and services, with annual fee to Wellington Company of:

(a) One half per cent on the first Seventy Million Dollars ($70,000,-000.00) of average net assets of Wellington Fund as of the end of each month;

(b) Three eighths per cent on the next Fifty Million Dollars ($50,-000,000.00) of average net assets of Wellington Fund; and

(c) One fourth per cent on average net assets of Wellington Fund over One Hundred Twenty Million Dollars ($120,000,000.00).

The total management fee paid by Wellington Fund to Wellington Company for these services in 1957, was $1,757,404.79. In 1958, the total management fee paid by Wellington Fund to Wellington Company was $2,040,474.96.

Walter L. Morgan, president and director of Wellington Fund, is the president, director and beneficial and record holder of the common stock and substantially all of the preferred stock in Wellington Company. At the date of the complaint five officers of Wellington Fund were officers or directors of Wellington Company and three other officers of Wellington Fund were also employees of Wellington Company.

Wellington Company, acting as principal underwriter only for Wellington Fund has not actively up to the date of the complaint in this case, distributed the securities of any other investment company, and receives from the total sales commission from the sales of Wellington Fund shares 2 per cent of the offering price on single transactions less than $25,000; 1½ per cent on single transactions of $25,000 but under $50,000; 1 per cent on single transactions of $50,000 but under $100,000; and 0.6875 per cent on single transactions of $100,000 and over.

In 1957, net commissions of Wellington Company, as principal underwriter and national distributor of Wellington Fund, were $757,716 on distribution of Wellington Fund shares, after payment of $4,476,057 to dealers and sales representatives. In 1958, Wellington Company reported net commissions of $861,-364.32 on distribution of Wellington Fund shares, after payment of $5,511,-532.75 to dealers and sales representatives.

Wellington Company, following the completion of the initial offering of Wellington Equity Fund shares, was intended to and did in fact become principal underwriter of Wellington Equity Fund shares whose shares it continuously offers at a price which is equal to the net asset value per share, plus a sales commission, retaining for itself as principal underwriter a commission in the amounts described above for underwriting Wellington Fund shares.

Wellington Company ceased acting as management adviser of Wellington Fund as of April 13, 1959, at which time the duties of investment adviser for Wellington Fund were undertaken by Wellington Management Company.

7. Defendant Wellington Equity Fund, Inc. (hereinafter called "Wellington Equity Fund") is a diversified management investment company incorporated on August 26, 1958, which is registered under the Investment Company Act of 1940. As of the filing of the complaint in this case, Wellington Equity Fund was a closed-end investment company but became an open-end investment company with redeemable shares upon completion of the initial public offering of 3,000,000 of its 50,000,000 authorized shares of common stock of one class of a par value of $1 per share. Wellington

Equity Fund had no stock outstanding at the date of the complaint but upon issuance of its shares of common stock, each share became entitled to one vote and participates equally in dividends, distributions, and net assets. Said shares are fully paid and non-assessable and with no preference on conversion, exchange, retirement, or any other feature. Its shares are redeemable at a redemption price to be ordinarily the net asset value per share.

The purpose and objectives of Wellington Equity Fund are to achieve growth of capital and increased income over the years by investments composed largely of common stock but which may also include securities such as bonds and preferred stocks which are convertible into common stocks, utilizing in the achievement of its objectives experienced investment management and diversifying its investments over a carefully chosen list of securities in a broad number of industries. All but one of the officers and/or directors of Wellington Equity Fund are officers and/or directors of Wellington Fund.

Paragraph Fifteenth (g) of the Certificate of Incorporation of Wellington Equity Fund provides:

"The Corporation (Wellington Equity Fund) acknowledges that it has obtained its corporate name by consent of The Wellington Company and agrees that if at any time the said The Wellington Company and/or an affiliate or a successor to the interests thereof (whether such succession be by merger, consolidation, purchase of assets, or otherwise) ceases to be the investment advisor of the Corporation (Wellington Equity Fund) and national distributor of its shares, it shall at the written request of said The Wellington Company and/or such affiliate or successor change its name so that no reference therein shall be contained to "Wellington", "Morgan", "Claymont" or "Locust Street".

8. Defendant Wellington Company, Ltd. (hereinafter called "Wellington, Ltd.") is a Delaware corporation incorporated on December 30, 1957, whose only present business is to serve as an investment advisor of Wellington Equity Fund under a management agreement pursuant to which Wellington, Ltd. is to furnish general management, investment management, research and statistical services to the investments of Wellington Equity Fund, for a fee payable quarterly in an amount equal to $\frac{1}{8}$ of 1 per cent (equivalent to $\frac{1}{2}$ of 1 per cent annually) of average net assets of Wellington Equity Fund. In return for this management fee, Wellington, Ltd. has agreed to furnish executive and designated administrative personnel to provide statistical, research and analytical services, to recommend purchases and sales when deemed necessary, and in general, to supervise the overall management and investment program of Wellington Equity Fund. At the date of the complaint, the personnel of Wellington, Ltd., consisted of seven part-time account supervisors, counsellors, and executives; six part-time economists, statisticians and research personnel; and 16 other part-time personnel, it being anticipated that the persons employed by Wellington Company in its investment advisory function for Wellington Fund would serve in similar capacity with Wellington, Ltd.

Walter L. Morgan, president and director of Wellington Fund and Wellington Equity Fund, is president and director of Wellington, Ltd. and beneficial and record holder of substantially all of the outstanding common stock of Wellington, Ltd. Mr. Morgan and members of his family own a substantial majority of the preferred stock of Wellington, Ltd. Wellington, Ltd.'s management contract with Wellington Equity Fund provides in Paragraph 5 thereof as follows:

"5. Except to the extent necessary for performance of Manager's (Wellington, Ltd.'s) obligations hereunder, nothing shall restrict the right of Manager or any of its directors, officers or employees of

Equity Fund to engage in any other business or to devote time and attention to the management or other aspects of any other business whether of a similar or dissimilar nature or to render service of any kind to any other corporation, firm, individual, or association."

9. Wellington Management Company (which is not named as a defendant in this action) is a Delaware corporation originally incorporated under date of February 20, 1933, with the name The Wellington Fund, Inc. By amendment to its Certificate of Incorporation dated June 1, 1935, the name of this company was changed to Wellington Investors, Inc. and by further amendment dated February 13, 1959, its name was changed to Wellington Management Company. Wellington Management Company under date of April 13, 1959, after the present litigation had been instituted, entered into an investment advisory contract with Wellington Fund whereby Wellington Management Company agreed to furnish advice and recommendations with respect to the purchase and sale of securities and the making of commitments; agreed to place at the disposal of Wellington Fund such statistical research and analytical and technical service, information and reports as may reasonably be required and further agreed to furnish Wellington Equity with all executive personnel and all other required personnel except for certain junior officers and employees. The said management advisory contract empowered Wellington Management Company in general to superintend the affairs of Wellington Fund subject to the control of the Board of Directors, Executive Committee and Financial Committee of the said Wellington Fund. The management advisory contract between Wellington Fund and Wellington Management Company provides in Paragraph Five thereof as follows:

"5. Except to the extent necessary for performance of Manager's (Wellington Management Company's) obligations hereunder, nothing shall restrict the right of Manager or its directors, officers or employees to engage in other business or to render investment, advisory, underwriting or other services to any investment company, or any other corporation, firm, association or individual".

10. Wellington Fund has used that name since July, 1935, when the Certificate of Incorporation of Industrial and Power Securities was amended to change the name of that company to Wellington Fund, Inc. The shares of Wellington Fund have been continuously distributed in interstate and intra-state commerce since July, 1935, and in literature and information relating to Wellington Fund, it has been referred to as "A name to remember when investing". Wellington Fund has become one of the nation's largest mutual funds and more of its shares measured in total dollars have been sold over the past five years than the shares of any other single dealer distributed mutual fund.

11. The officers and directors of Wellington Fund have holdings in the aggregate of less than $\frac{1}{4}$ of 1 per cent of its outstanding shares, have the duties and responsibilities which are attendant upon those positions and as such exercise management over Wellington Fund. The said officers and directors permitted Wellington Equity Fund to be incorporated with the name "Wellington Equity Fund, Inc." although the stockholders of Wellington Fund have not given express approval of use by Wellington Equity Fund, Inc. of that name nor have such stockholders given express authority for such action.

12. As of the present time, Wellington Equity Fund has more than 28,000 shareholders and net assets of more than $41,000,000.

13. Financial & Power Securities Co. was a Delaware corporation incorporated on August 20, 1929. Financial & Power Securities Co., by amendment to its Certificate of Incorporation filed July 2, 1931, changed its name to The Wellington Corporation. It was investment ad-

visor for Wellington Fund (then Industrial & Power Securities Co.) until on or about April 13, 1952. Wellington Corporation was dissolved by a Certificate of Dissolution filed with the Secretary of State of the State of Delaware in September 24, 1952.

14. In connection with the liquidation and dissolution of Wellington Corporation there was no formal written conveyance of the name to anyone.

15. On or before June 19, 1935, Industrial and Power Securities Co. sent a letter to Wellington Corporation advising that the name of Industrial and Power Securities Co. had been changed to Wellington Fund, Inc. The Board of Directors of Wellington Corporation at a meeting on June 19, 1935, adopted a resolution directing its proper officers to execute a consent to the use of the said name.

16. Under date of March 28, 1952, there was filed with the Secretary of State of the State of Delaware by Wellington Corporation a document advising that the said corporation proposed to dissolve within 90 days from the said date and did thereby consent to the use of the name of The Wellington Company by W. L. Morgan & Company.

17. The directors of Wellington Fund, at a meeting held February 27, 1952, recorded in their Minutes as follows:

"The Chairman then referred to the informal discussions previously had concerning the renewal of the Investment Advisory Contract between Wellington Fund and Wellington Corporation. A general discussion of this subject followed and it was the sense of the meeting that the present contract between the Fund and Wellington Corporation should not be renewed but that the activities of Wellington Corporation and W. L. Morgan & Company should be combined into one company for greater efficiency and the Investment Advisory Contract be made with this company. It was pointed out that if this combination of activities were to be made effective, it would be much preferable for W. L. Morgan & Co. to be the surviving corporation by reason of its many hundreds of contracts with investment dealers throughout the country and by reason of its position and agreements with The Pennsylvania Company for Banking and Trusts in the operation of the Wellington Investment Plan. However, it was felt advisable to retain the Wellington name for the investment advisor, which would require a change in the name of W. L. Morgan & Co. to The Wellington Company, which company had consented to this change."

18. There were filed with the Secretary of State of the State of Delaware under date of December 30, 1957, by Wellington Co., Wellington Fund and Wellington Co. of Delaware documents consenting to the organization of Wellington Company, Ltd., in the State of Delaware. Such action was taken without the express approval of the shareholders of Wellington Fund.

19. No registration statement under the Investment Company Act of 1940 has been filed by or on behalf of any defendant or any entity related to any defendant other than Wellington Fund, Inc., Wellington Equity Fund, Inc. and Wellington Foundation.

20. When consideration was being given to the creation of a second mutual fund which ultimately became Wellington Equity Fund, it was intended to use the name Wellington.

21. The same securities may and in some instances do appear in the portfolio of Wellington Fund and Wellington Equity Fund.

22. There are some shareholders in common between Wellington Fund and Wellington Equity Fund.

23. Many of the dealers who deal in and sell shares of Wellington Fund also deal in and sell shares of Wellington Equity Fund.

24. All of the dealers and sales representatives who deal in and sell shares of Wellington Fund have been given the right to sell shares of Wellington Equity Fund as well.

25. On or about September 4, 1958, plaintiffs through their representatives objected to the officers and directors of Wellington Fund about the creation of Wellington Equity Fund, but their requests for a change of the plans relating to Wellington Equity Fund were not complied with.

The Complaint is in six counts. Counts I and VI charge the defendants with unfair competition in the use of the name "Wellington". The remaining counts, II through V, assert the alleged acts of unfair competition also constitute violations of the Securities Act of 1933[3] (Count II), the Securities Exchange Act of 1934[4] (Count III), the Investment Company Act of 1940[5] (Count IV), and the Federal Trade Commission Act[6] (Count V). Diversity of citizenship and federal question jurisdiction are asserted.

This suit was instituted October 3, 1958. Approximately two months before, on July 25, 1958, Congress amended 28 U.S.C. § 1332 to provide:

"(c) For the purposes of this section and section 1441 of this title, a corporation shall be deemed a citizen of any State by which it has been incorporated *and of the State where it has its principal place of business.*" (Emphasis supplied.)

The Complaint is silent concerning defendants' principal places of business. In response to Court inquiry counsel for defendants advised that the principal offices of defendants at the commencement of the present action were situated as follows:[7]

Wellington Fund, Inc. Delaware
Wellington Equity Fund Delaware
Wellington Company, Ltd. Delaware
The Wellington Company Pennsylvania

A serious jurisdictional question is thus posed by virtue of the 1958 amendment noted above insofar as diversity is relied on for jurisdiction. After a proper alignment of the parties to reflect their actual interests, there must be complete diversity between the plaintiffs on the one hand, and the defendants on the other, i. e., each plaintiff must be able to sue each defendant.[8] The primary purpose of the 1958 amendment in redefining corporate citizenship was to restrict federal jurisdiction.[9] Subsection (c) is consonant with the declared policy toward "greater recognition of local corporate activity as equivalent to citizenship for diversity purposes."[10]

The plaintiffs are citizens of the Commonwealth of Pennsylvania. In view of the dual corporate citizenship conferred by 28 U.S.C. § 1332 as amended, Wellington Company having its principal place of business in Pennsylvania would also be deemed a citizen of Pennsylvania. Consequently, there would not be complete diversity between the plaintiffs and

3. 15 U.S.C.A. § 77a et seq.

4. 15 U.S.C.A. § 78a et seq.

5. 15 U.S.C.A. § 80a–1 et seq.

6. 15 U.S.C.A. § 41 et seq.

7. Defendants' Brief On The Alleged Violation Of The Federal Statutes, p. 2; plaintiffs do not take issue with defendants' statement. Further, the exhibits in evidence confirm the information submitted. PX 21, 22; DX 4 at pp. 227, 228.

8. Strawbridge v. Curtiss, 1806, 3 Cranch 267, 2 L.Ed. 435; 1 Moore's Federal Prac. ¶ 0.60 [8.–4], p. 644.

9. "Going back to the legislative history of the 1958 amendment, we find that its primary purpose was to reduce the heavy workload of the federal courts caused, in part, by diversity of citizenship cases in which jurisdiction was based on the fictional premise that a corporation, although wholly local in character and operation, is a citizen of another State because of its incorporation in that State." Harker v. Kopp, D.C.N.D.Ill. W.D.1959, 172 F.Supp. 180, 182.

10. Feuchtwanger Corp. v. Lake Hiawatha Fed. Cr. Union, 3 Cir., 1959, 272 F.2d 453, 456.

defendants and diversity jurisdiction would not obtain.

■ A plaintiff under F.R.Civ.P. 21 * may be permitted to drop a party not indispensable to the lawsuit whose presence destroys jurisdiction.[11] The rule does not, however, authorize the Court on its own motion to dismiss a party who is properly joined but as to whom the Court lacks jurisdiction.[12] Plaintiffs have made no application to have Wellington Company dropped as a party defendant, nor have the parties attempted to invoke any of the principles governing ancillary jurisdiction to temper the harsh result caused by the complete diversity doctrine.[13] Instead, plaintiffs rely on the principle of pendent jurisdiction as enunciated in Hurn v. Oursler [14] and Bell v. Hood [15] to clothe the Court with the requisite jurisdiction to entertain the common law unfair competition causes. The legal tenets involved have been fairly analyzed by counsel for defendants as follows: [16]

"As I read the decisions in Bell v. Hood, 327 U.S. 678 [66 S.Ct. 773, 90 L.Ed. 939] (1946), * * *, and Hurn v. Oursler, 289 U.S. 238 [53 S.Ct. 586, 77 L.Ed. 1148] (1933) * * * the following legal principles appear to be clear:

"1. If a Complaint seeks recovery under the Constitution or Federal Statutes, the Court has jurisdiction even though it may ultimately decide that no cause of action is stated or sustained under the Constitution or the Statutes, unless

"(a) The claim under the Statute or Constitution is clearly immaterial *and* made solely for the purpose of obtaining jurisdiction, or

"(b) The claim is wholly insubstantial and frivolous.

"2. If there are Federal grounds and non-Federal grounds asserted as a basis for relief on the same facts, the Federal Court will have jurisdiction over the entire case even though it determines that no cause of action is made out under the Federal grounds."

Defendants concede, the Complaint "seeks recovery, in Counts II through V, under the Federal Statutes referred to therein and that the same facts are asserted as the basis for the common law Counts of the Complaint as are asserted as the basis for Counts II through V. * * * [T]hat Counts II through V were not added solely for the purpose of obtaining jurisdiction."[17] Defendants, however, reserve the right to argue Counts II through V do not state causes of action and these counts are "insubstantial and frivolous."[18] For an effective examination of these issues it is necessary at this stage to consider the substance of the common law counts.[19]

■ State law is applicable where diversity is present and the unfair competition does not come within the provisions of the Lanham Act, 15 U.S.C.A. § 1051 et seq.[20] There is, however, a

---

* 28 U.S.C.A.

11. 1 Moore's Fed.Prac. ¶ 0.60 [8.-5], p. 645.

12. 3 Moore's Fed.Prac. ¶ 21.03, p. 2904.

13. 1 Moore's Fed.Prac. ¶ 0.60 [8.-4], p. 645.

14. 1933, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148.

15. 1946, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939.

16. Letter Memorandum dated October 30, 1959.

17. Note 16, supra.

18. Ibid.

19. Counsel for plaintiffs at the pre-trial conference stated: " * * * But I do say that as I view it now, if I am unable to make out a cause of action in Counts 1 and 6, my current thinking is that the other counts go by the board." Transcript of Pre-trial Conference, p. 88.

20. "The only cause of action that this record could possibly support is for unfair competition and common law 'trademark infringement', to which local law applied." Pecheur Lozenge Co. v. National Candy Co., 1942, 315 U.S. 666,

split of authority as to the governing law where pendent jurisdiction is involved.[21]

Judge Wyzanski in National Product Fruit v. Dwinell-Wright Co. after exploring the formidable position in favor of applying uniform principles to unfair competition claims, concluded the arguments not to be controlling and that a court having pendent jurisdiction should apply local common law in adjudicating the unfair competition action.[22] One

commentator, preferring Judge Wyzanski's rationale, has observed: "It would seem anomalous to apply federal law to a claim which, if it were not pendent under section 1338(b), would be governed by state law." [23]

Professor Moore, on the other hand, advocates application of federal law where jurisdiction is pendent and the unfair competition is multi-state in effect.[24] This approach, indeed, has merit

667, 62 S.Ct. 853, 86 L.Ed. 1103. But Professor Moore would limit the scope of the Pecheur rule where multi-state activities are involved:

"* * * But we question the soundness of this rule when applied to multistate activities for the following reasons: even if the federal courts have not as yet been given jurisdiction, because of the subject matter of the claim, this is not determinative—they did not have general federal question jurisdiction until 1875 but that did not preclude many matters that had to go up through the state courts, except where the accident of diversity enabled the suit to be brought in the federal court, from involving federal, not state, law; a federal matter may be presented in a case where jurisdiction is predicated upon diversity; the law of one state, whether it be its domestic or conflicts rule, should not govern multistate activities for this is to project itself beyond its proper local limits and into the national area; uniformity, instead of the possible 48 diverse, conflicting, and competing rules, is desirable. On this theory, but not on its theory of equitable remedial rights, Black & Yates, Inc. v. Mahogany Ass'n, Inc. [3 Cir., 129 F.2d 227] correctly held that in an action between rival dealers operating in many states, a federal court in Delaware could enjoin a continuing trade libel, although the Delaware law did not authorize an injunction but afforded only a right of action for damages. And full faith and credit may properly limit the local law of one state from determining rights and matters having a national scope." 1 Moore's Fed.Prac. ¶ 0.326, pp. 3772–3773.

21. Maternally Yours v. Your Maternity Shop, 2 Cir., 1956, 234 F.2d 538, 540, fn. 1, 545–547; National Fruit Product Co. v. Dwinell-Wright Co., D.C.Mass. 1942, 47 F.Supp. 499, 502–504, affirmed 1 Cir., 1944, 140 F.2d 618; Bulova Watch Co. v. Stolzberg, D.C.Mass.1947,

69 F.Supp. 543; 1 Moore's Fed.Prac. ¶ 0.60 [8.–7] p. 661; ¶ 0.326, p. 3772.

22. D.C.Mass.1942, 47 F.Supp. 499, 502–504.

23. Developments in the Law Trade-Marks And Unfair Competition, 68 Harv.L.Rev. 814, 885 (1955).

24. "To the extent, if any, that the Lanham Act does not create a federal claim for unfair competition, but this claim is being adjudicated in the federal court because pendent to another claim over which the federal court has jurisdiction, a question arises as to what substantive law applies to the claim for unfair competition. Where this unfair competition is multi-state in effect, as distinguished from only local impact, we believe federal common law should govern." 1 Moore's Fed.Prac. ¶ 0.60 [8.–7], p. 661.

* * * * *

"* * * Now what as to a claim for unfair competition over which the district courts have jurisdiction 'when joined with a substantial and related claim under the copyright, patent or trademark laws?' There is much authority that the state law of the forum, including its conflicts rule, applies. A contra and a better rule, where the matter is interstate in character, has been applied by Judge Sweeney for the following reasons: 'I feel that there is a strong policy in favor of interstate uniformity in the field of unfair competition. There is the dilemma between a checker-board result in the automatic application of (the conflicts rule of) Klaxon Co. v. Stentor Electric Mfg. Co. [313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477] to multi-state unfair competition on the one hand, or a return, on the other, to the evils of choice of forum if local law is to govern the interstate as well as local aspects of the tort.' * * *" 1 Moore's Fed.Prac. ¶ 0.326, p. 3772. See also concurring opinion of Chief

when it is considered that prior to Erie v. Tomkins,[25] federal law was considered as controlling issues of both trademark infringement and unfair competition. As a consequence, the states had little occasion to build an independent body of case law in these areas.[26] For this reason, and because of the multi-state nature of the problem, instead of formulating novel concepts many present day courts after paying homage to Erie resort to the well defined federal doctrines.[27]

A canvass of the Delaware decisions reveals that the local courts apply the universal principles governing the law of unfair competition. In Standard Oilshares v. Standard Oil Group, the Chancellor following an extensive quote from the United States Supreme Court's decision in American Steel Foundries v. Robertson,[28] stated:

"A corporate name being thus categorized as either a trade-name or trade-mark, more properly the former, the right to the exclusive use of such a name is to be tested, as before indicated, by the principles

which govern in the law of unfair competition." [29]

The principle was reaffirmed in American Radio Stores v. American R. & Television S. Corp.[30] and has never been repudiated by any Delaware decision. In E. I. Du Pont de Nemours & Co. v. Du-Pont Safety R. Corp.[31] The Court of Chancery in enjoining a razor manufacturer from appropriating the DuPont symbol, predicated its determination exclusively upon its own pre-Erie decision in American Radio Stores v. American R. & Television S. Corp. supra, the Restatement of the Law of Torts,[32] two federal decisions—Best Foods v. General Mills,[33] Telechron, Inc. v. Telicon Corp.,[34] and an adjudication of a New York trial court.[35] Similarly in Coca-Cola Co. v. Nehi Corporation, the Delaware Chancery Court citing the federal decision in Allen v. Walker & Gibson, D.C., 235 F. 230, adopted the fundamental precept that to constitute trade name infringement it is not necessary that the similarity in the name complained of be "such as to deceive only the cautious

Judge Clark in Maternally Yours v. Your Maternity Shop, 2 Cir., 1956, 234 F.2d 538, 545–547.

25. 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188.

26. Maternally Yours v. Your Maternity Shop, 2 Cir., 1956, 234 F.2d 538, 540, fn. 1; 1 Moore's Fed.Prac. ¶ 0.326, p. 3770.

27. " * * * Since problems of unfair competition in trade and trade names almost invariably concern also trade-marks and transcend state lines, it is not surprising that the governing law developed in the federal courts and much of its doctrine is connected with the names of great federal judges. So the issue is really whether we shall apply our regurgitation of the state redistillation of federal precedents or go more directly and realistically to the sources themselves. Actually, so far as I can discover, we have never found any difference in ultimate result, and so quite often lump federal and New York law together, (citing cases), or—even more conveniently—eschew all reference to the

matter * * *." Maternally Yours v. Your Maternity Shop, 2 Cir., 1956, 234 F.2d 538, 545.

28. 1926, 269 U.S. 372, 46 S.Ct. 160, 70 L. Ed. 317.

29. Ct. of Chancery, Del.1930, 17 Del.Ch. 127, 150 A. 174, 180.

30. "Inasmuch, however, as a corporate name is now under the Delaware law to be categorized with unregistered trademarks (Standard Oilshares, Inc., v. Standard Oil Group, Inc., supra) the protection to the complainant can extend only so far as is allowable under the general principles of law governing in unfair competition cases. * * *" Ct. of Chancery, Del.1930, 150 A. 180, 183.

31. Ct. of Chancery, Del.1951, 32 Del.Ch. 156, 82 A.2d 384.

32. 3 Restatement of the Law of Torts, § 730.

33. D.C.Del.1945, 59 F.Supp. 201.

34. D.C.Del.1951, 97 F.Supp. 131.

35. Tiffany & Co. v. Tiffany Productions, Inc., 147 Misc. 679, 264 N.Y.S. 459.

purchaser" but that it is sufficient if the similarity in name is such "that it is likely to deceive the ordinary purchaser." [36]

The parties have cited no law, nor has the Court in its independent research, discovered any authority indicating that the decisional law of Delaware, in any respect, conflicts with the fundamental principles of the law of unfair competition herein pertinent, that have been formulated and articulated by federal tribunals. No exception has been interposed by either side as to the governing rules. Issue is taken merely with respect to application of the appropriate principles to the particular fact complex.

■ Wellington Fund and Wellington Equity Fund are national in scope, therefore a Delaware Nisi Prius Court would be expected to draw heavily on general principles, instead of becoming bogged down in difficult sophisticated conflict of laws problems.[37] Against this background it becomes unnecessary to formally declare and be counted either as favoring the local law approach of Judge Wyzanski or the uniform federal system to the extent advocated by Professor Moore.[38]

The thrust of plaintiffs' case is simply that Wellington Fund owns the name "Wellington" and has the right to use that name to the exclusion of all others in the investment company industry.[39] Defendants counter contending:

1. The Goodwill inherent in the name "Wellington" does not relate to any activity of Wellington Fund, but symbolizes the activities of the investment manager and sponsor.[40]

2. There is neither actual confusion nor likelihood of confusion of the public resulting from the use of the name "Wellington" by Wellington Equity Fund.[41]

3. The creation and continued existence of the Wellington Equity Fund have not, and will not, damage Wellington Fund, but have been, and will be, of advantage to Wellington Fund.[42]

4. Wellington Fund has validly and properly consented to the use of the name "Wellington" by Wellington Equity Fund.[43]

---

36. Coca-Cola Co. v. Nehi Corp., 1942, 26 Del.Ch. 140, 25 A.2d 364, 369.

37. "A state court in a multiple state factual situation faces a difficult conflict of laws problem. Generally a state court will consider the law of each state where the wrong occurred. One federal court sitting in Pennsylvania has talked in the following terms,
"'We find therefore in substance that the states in which Ettore asserts his rights were injured are Pennsylvania, Delaware, New Jersey and New York. We must now look to Pennsylvania law with regard to the alleged injuries in Pennsylvania and, under the Pennsylvania conflict of laws rule, to the laws of Delaware and New Jersey as to the Pennsylvania telecasts and to the law of New York as to the New York telecasts, to determine what damage, if any, Ettore suffered on each of these jurisdictions.'" 1 Moore's Fed.Prac. ¶ 0.327, pp. 3775-3776.

38. "In his Conclusion of Law the trial judge decided that the plaintiff's claim of unfair competition is governed wholly by federal law. Actually no problem arises in this appeal with respect to the law controlling the particular unfair competition charged. At the very least in this circuit we agree with the New Jersey decisions that likelihood of confusion is the test and that secondary meaning for plaintiff's mark need not be established in order for plaintiff to make out a cause of action. * * *" Perfectform Corp. v. Perfect Brassiere Co., 3 Cir., 1958, 256 F.2d 736, 741.

39. Counsel for plaintiffs at the pre-trial conference stated:
"I think the issues, therefore, really ultimately revolve around primarily whether or not the inside or management group have the ownership of the name 'Wellington', which is asserted by way of defense, or whether it belongs to Wellington Fund and its shareholders." Transcript of Pre-trial Conference, p. 7.

40. Brief of Defendants Sur Requests for Findings of Fact And Conclusions of Law, p. 4. (Hereafter referred to as Def.Br.)

41. Id. at p. 32.

42. Id. at p. 45.

43. Id. at p. 66.

5. Wellington Fund is not the owner of trade name rights in the name "Wellington" because it was not the first to use the name in this field, because it acquired the name only by the consent and license from the predecessor to the Wellington Company and because it has not had the exclusive use of the name in this field.[44]

These matters will be considered seriatim.

## I.

 In limine it is clear that if plaintiffs be correct in their contentions the charge of unfair competition has been sustained for, "the most common form of unfair competition is the imitation of a trade name, trade symbol or device by a competitor."[45] Defendants' position on this initial point follows:[46]

"The name 'Wellington' has value only as a symbol of goodwill. The goodwill has been generated by the investment management and distribution services which have been supervised, controlled and performed by the Wellington Company. The goodwill, and thus the name, belong to the Wellington Company. That being so, it is entirely proper for the Wellington Company to use the name on a second of its products so long as there will be no confusion of the public and no damage to the first product. This is a situation in which the second son automatically takes the family name of his father.

"The complaint alleges that the name 'Wellington' has acquired a well-recognized meaning and reputation in the investment field, but Plaintiffs offered no evidence as to what that meaning and reputation are. Defendants' evidence establishes beyond question that the meaning and reputation are identified with the investment manager and sponsor.

"Perhaps it should be observed in passing that, in concluding that the Wellington Company owns the goodwill and the name it is not necessary to consider what rights Wellington Fund may have to use the name. That question is not raised by this case, and is not involved in such disposition of it."

Defendants basic theme is that the entity responsible for generating goodwill is entitled to employ the name symbolizing the goodwill. Plaintiffs contend, (1) a corporate name belongs to the corporation; and (2), the goodwill of a business conducted by a corporation belongs to the corporation.

 Wellington Fund is not the corporate shell defendants would have this Court find.[47] Wellington Fund is an $858 million corporation and has over 262,000 stockholders.[48] There are 13 persons on the Board of Directors,[49] seven of whom are not permitted by law to have any affiliation with either the managing or sponsoring companies.[50] Wellington Fund was formed pursuant to the corporate laws of the State of Delaware, which provide in part:[51]

"(a) The business of every corporation organized under the provisions of this chapter shall be managed by a board of directors, except as hereinafter or in its certificate of incorporation otherwise provided."

44. Id. at 1–a.

45. Nims, Unfair Competition and Trademarks, Vol. 1, p. 14.

46. Brief of Defendants Sur Request For Findings Of Fact And Conclusions Of Law, p. 31.

47. "One may ask 'What is the reason for the existence of Wellington Fund if it engages in no activities and is a mere conduit or shell?' " Def.Br. p. 9.

48. PX 29; DX 5; Statistics reflect condition of Wellington Fund as of Dec. 31, 1958.

49. PX 29.

50. 15 U.S.C.A. § 80a–10.

51. 8 Del.Code Annotated § 141(a).

The by-laws of Wellington Fund state:[52]

"Fifth: The property and business of the Corporation shall be managed and controlled by its Board of Directors, thirteen in number. * * *.

"Sixth: The Board of Directors shall have, in addition to such powers as are hereinafter expressly conferred on it, all such powers as may be exercised by the Corporation, subject to the provisions of the statute, the certificate of incorporation and the bylaws, subject also to regulations which may be from time to time made by the stockholders."

The Investment Company Act of 1940 declares that,

"(a) * * * [I]t shall be unlawful for any person to serve or act as investment adviser of a registered investment company, except pursuant to a written contract, which contract, * * * has been approved by the vote of a majority of the outstanding voting securities of such registered company and—

* * * * * *

"(2) shall continue in effect for a period more than two years from the date of its execution, *only so long as such continuance is specifically approved at least annually by the board of directors* or by vote of a majority of the outstanding voting securities of such company;

"(3) provides, in substance, that it may be terminated at any time, without payment of any penalty, *by the board of directors of such registered company* or by vote of a majority of the outstanding voting securities of such company on not more than sixty days' written notice to the investment adviser; and

"(4) provides, in substance, for its automatic termination in the event of its assignment by the investment adviser.[53]

"(b) * * * [I]t shall be unlawful for any principal underwriter for a registered open-end company to offer for sale, sell, or deliver after sale any security of which such company is the issuer, except pursuant to a written contract with such company, which contract, * * * —

"(1) shall continue in effect for a period more than two years from the date of its execution, *only so long as such continuance is specifically approved at least annually by the board of directors* or by vote of a majority of the outstanding voting securities of such company; and

"(2) provides, in substance, for its automatic termination in the event of its assignment by such underwriter."[54] (Emphasis supplied.)

Defendants recognize the Board of Directors are required to, and in fact, do function in a significant manner:

" * * * The directors bring to Wellington Fund board their good sense, knowledge and experience for the primary purpose of seeing to it that the investment manager lives up to that contract and operates within the objectives and fundamental policies which have been established for the Fund and which cannot be changed without shareholder approval under the Investment Company Act of 1940; 15 U.S. C. § 80a–13.

"The testimony demonstrates that the Board of Directors of Wellington Fund fully discharges this responsibility. It receives at each meeting a full and complete report as to every change in the portfolio of the Fund together with the reasons for the change. Economic and market forecasts are presented by the investment manager and an indication is given as to the plans which

52. Joint EX 1, Item 14.

53. 15 U.S.C.A. § 80a–15(a).

54. 15 U.S.C.A. § 80a–15(b).

the manager intends to follow for the following period. In this respect the Board of Directors is exercising *watchdog responsibilities* and appropriate supervision of the corporate affairs, but it does not 'control' the investment management provided by the investment manager.

*"Of course, the Board of Directors has the right and power of absolute control in that it could, if it so decided, refuse to follow the advice of the investment manager, direct that the investments be made in accordance with its own decisions, and terminate the management contract."* [55] (Emphasis supplied.)

Defendants describe the workings of an investment company as,

" * * * [A] large number of investment advisory or investment counsel accounts put together into a convenient corporate structure or in some cases a form of trust, and these companies are created by a sponsor, an originator, who usually is a man experienced in investment management, or men, I mean to say, and companies have been formed originally to provide to the average person of limited means the same type of investment counsel services and an opportunity for diversification that prior to their creation was available only to fairly wealthy people, and I think that the best definition that I have ever come across of an investment company is just that, that it is a group of investment counsel accounts under management." [56]

Defendants suggest that from a functional standpoint Wellington Fund operates in the same manner as a business trust, and that "it would be absurd for the law to distinguish insofar as goodwill is concerned between a corporate mutual fund and a mutual fund in business trust form or a common trust fund of a bank." [57] In effect, defendants urge that the corporate veil of Wellington Fund be pierced, or in the alternative, that special principles be held applicable to investment companies.

The Court is mindful that seemingly many practices prevail in this industry that in other areas are legally and economically intolerable, and perhaps this Court in adopting plaintiffs' contentions is out of step with a "fourteen billion dollar mutual fund industry." [58] It would, however, be unwise at this time to sit in judgment of the entire industry and the Court will not attempt to determine any controversy except that which is now before it.

The defendants have chosen to conduct their affairs via the corporate form. Sound policy reasons dictate, no exception be made in the instant litigation which would permit defendants to function outside the carefully delimited boundaries of corporate law. Wellington Fund is the second largest diversified, open-end, balanced fund and ranks third among all mutual funds operating in the United States.[59] Defendants submit, "it is not necessary to consider what rights Wellington Fund may have to use the name," [60] for all the Court need do is conclude Wellington Company owns the "Wellington name with its attendant goodwill". The Court is thus asked to forsake 262,000 investors with holdings of $858 million in favor of a corporation controlled by one person, Walter L. Morgan, who is also president and director of Wellington Fund.[61] If this Court did

55. Def.Br. pp. 16–17.

56. N.T. 209–210.

57. Def.Br. p. 8.

58. Def.Br. pp. 74–75.

59. Investment Companies, 1959 Ed. p. 228; DX 5.

60. "That question is not raised by this case, and is not involved in such disposition of it." Def.Br. p. 31.

61. Walter L. Morgan, president and director of Wellington Fund, is the president, director and beneficial and record holder of the common stock and substantially all of the preferred stock in Wellington Company. Stipulated Fact No. 6.

as defendants suggest, i. e., hold Wellington Company owns the name "Wellington" without determining the interest of Wellington Fund in the name, there would be nothing to prevent Wellington Company at some future time, in the event the present management contract was terminated, from seeking to enjoin the use of the name by Wellington Fund.[62]

Defendants urge this Court enunciate a rule that the entity responsible for generating the so-called "habit of patronage" is entitled to the ownership symbol reflecting it.[63] Defendants proceed that in this instance the goodwill has been generated by the investment management and distribution services, which have been supervised, controlled and performed by Wellington Company.[64] In conclusion defendants state: "that being so, it is entirely proper for the Wellington Company to use the name on a second of its products." [65]

This rationale is deemed patently vulnerable. To hold the creator of goodwill is entitled to own the symbol signifying the goodwill, would mean that the management team of any company could exploit the name of the employer at management's pleasure. To state the proposition exposes its untenability. It would mean, General Motors does not have the exclusive right to use its name. It would mean, that perhaps, the president of American Motors, if he desired, could appropriate the name "American Motors" for his own selfish purposes. It would mean that where a Madison Avenue advertising firm created an image that was paid for and adopted by a client, the client, nevertheless, did not own that which it purchased. Defendants conceding that General Motors owns its own name to the exclusion of all others, contend the appropriate analogue to be:[66]

"This case in my judgment, * *, is a situation in which, to use another analogous situation which I think is clear to us, where the purchaser of a box of Kleenex has come into this Court and said, 'We have a name, we bought this box, it is valuable, and we want you to prevent Kimberly & Clark, the corporation that produced this box of Kleenex and published the name, from bringing out another hand towel, paper towel, and using the name Kleenex on that paper towel.' These shares of Wellington are the product being sold. This is not anything like the normal situation in which a corporation is building up its own goodwill. Most corporations which are building up goodwill of their own are doing it with respect to a product which they are issuing and selling and which inures to the benefit of their shareholders. This is not that situation because the product here, if it is a product, or a commodity, however we want to call it in a broad term, is the shares of the Fund itself. The shares are what are being sold, and they are traded in far differently from the shares of any other corporation or corporations in the customary sense. And in that sense the mutual fund is a far different breed of cats than the normal business corporation."

This reasoning requires the conclusion the $858 million dollar Wellington Fund is the captive of one man, Walter L. Morgan. The Kleenex analogy com-

---

62. There have been, in fact, instances during the past ten years where investment companies have not renewed or terminated advisory contracts and selected entirely new investment counsel. Investment counsel changes have been reported for the following funds: Axe-Houghton Stock Fund in 1950; Dreyfus Fund in 1951; and Aberdeen Fund in 1953. Investment Companies, 1959 Ed. pp. 126, 127, 131; DX 4.

63. Def.Br. p. 31.

64. Ibid.

65. Ibid.

66. N.T. 79–80.

pletely ignores the fact that the paper product of Wellington Fund embodies the incidents of corporate ownership. One such incident being a voice in the approval or disapproval of the investment advisory and underwriting contracts.[67]

The concomitants alleged by defendants responsible for creation of the goodwill are the distribution and investment management services.[68] Both of these functions are either directly or indirectly paid for by Wellington Fund.

Wellington Fund shares are distributed by Wellington Company pursuant to a year to year agreement dated December 1, 1953 terminable at any time by Wellington Fund according Wellington Company six months notice.[69] This agreement provides:

"7. It is hereby mutually agreed that [Wellington] Company in full satisfaction of all services herein agreed to be performed by it in this Agreement shall retain a sum equal to 8% of the offering price of all shares of Fund sold by it * * ."[70]

Wellington Company as principal underwriter and distributor of Wellington Fund shares received net commissions of $757,716 in 1957 and $861,364.32 in 1958.[71] It is not denied, the advertising campaigns and extensive sales programs conducted by Wellington Company enhanced the value of the Wellington name. Wellington Company, however, was generously compensated for its endeavors made possible solely by virtue of its exclusive underwriting arrangement with Wellington Fund permitting Wellington Company to retain 8 per cent of the offering price of Wellington Fund shares sold.[72] Wellington Company simply asks too much when it insists upon the right to exploit the symbol, in addition to the handsome monetary rewards it has already received.

■ Similarly, the management element affords defendants' position little. Wellington Fund paid Wellington Company $1,757,404.79 in management fees for the year 1957 and $2,040,474.96 in 1958.[73] The management contract, under the Investment Company Act of 1940, must be specifically approved "at least annually by the board of directors or by vote of a majority of the outstanding voting securities of such company",[74] and may be terminated by Wellington Fund upon sixty days' notice.[75] Congress in requiring yearly approval was clearly attempting to create an atmosphere of objectivity for directors and/or shareholders of investment companies at relatively short periodic intervals to specifically appraise and evaluate the performance of the investment adviser, and if

---

67. See notes 53, 54, supra, and accompanying text; N.T. 243.

68. Def.Br. p. 31.

69. Joint Ex. 2, Item 16.

70. Ibid.

71. Stipulated Fact No. 6.

72. Note 70, supra.
 There is no requirement that a Fund's shares be distributed by an underwriter. In fact, more than a few investment companies distribute their own shares exacting no selling charge from the purchasers, namely:
 de Vegh Mutual Fund, Inc. DX 4, p. 158
 The Lazard Fund, Inc. DX 4, p. 193
 T. Rowe Price Growth

Stock Fund, Inc. DX 4, p. 211
 Stein Roe & Farnham
 Balanced Fund, Inc. DX 4, p. 219
 Other investment companies although they engage the services of underwriters maintain a policy of issuing their shares at net asset value without imposition of a sales charge:
 Loomis-Sayles Mutual
 Fund, Inc. DX 4, p. 195
 Scudder, Stevens & Clark Common Stock
 Fund, Inc. DX 4, p. 214
 Scudder, Stevens & Clark Fund, Inc. DX 4, p. 215.

73. Stipulated Fact No. 6.

74. 15 U.S.C.A. § 80a–15(a) (2).

75. 15 U.S.C.A. § 80a–15(a) (3).

the adviser were not performing satisfactorily Congress intended that the investment company have complete freedom to terminate the advisory contract.[76] This determination of the directors or shareholders must be insulated from extraneous considerations. To hold the investment company must cease using its name, if the advisory contract be terminated or that the investment adviser may exploit the name of the investment company for its own selfish ends would simply frustrate the clearly defined legislative purpose, by interjecting into the deliberations subtle pressures tending to undermine the objectivity required of the directors and shareholders.

Defendants' position is certainly not enhanced by the action of Wellington Fund engaging a new corporation, Wellington Management Company in April 1959 as its investment adviser.[77] Endorsement of defendants' views that the name of a corporation belongs to the entity or entities responsible for generating the goodwill and that in the instant case, the goodwill is attributed to the management and distribution functions, would require devising an arithmetic formula in order to properly allocate proprietary interests in the Wellington name. Mathematics has no office in determining ownership to this valuable corporate asset. There is simply no basis in law, or in fact, for defendants' theory attributing the ownership of the name and goodwill of Wellington Fund to Wellington Company because at one time Wellington Company managed Wellington Fund's investment portfolio and distributed its shares.

76. See note 62, supra.

77. Stipulated Fact No. 9.

78. Def.Br. pp. 43–44.

79. But compare defendants' statement appearing in this paragraph with the following testimony of defendant's expert Shallcross at page 604 of the notes of testimony:
By Mr. Mungall (Attorney for defendants).
"Q. Has there ever come to your attention Mr. Shallcross, a situation involv-

## II.

Plaintiffs allege employment by Wellington Equity Fund of the words "Wellington" and "Fund" is likely to cause confusion or mistake or to deceive the investing public in view of the prior user of "Wellington" and "Fund" by Wellington Fund since 1935. Defendants submit this is not so:[78]

"Wellington Fund and Wellington Equity Fund serve far different and well recognized basic needs or desires of investors. They are sold by investment dealers who are well aware of these differences and whose best interests are served by making known to the customer these differences in his own needs and desires and in the objectives of the Funds. The literature relating to the two Funds clearly differentiates between them. Actual confusion and likelihood of confusion of one Fund with another in this situation is nonexistant.

"Although Plaintiffs had the burden of proving actual confusion or likelihood of confusion of one fund with the other, they offered no evidence on that score. In view of the wide spread practice over many years of having several funds under the same sponsor with similar names, such evidence would have been readily available had there been confusion with any degree of frequency. Plaintiffs' failure to produce evidence of confusion strongly corroborates the conclusion that there has been none.[79]

ing two or more Funds with similar names under the same sponsorship where one Fund had been confused with the other in some fashion? A. In isolated cases, yes. I have had some experience where M.I.T. orders were executed in mistake for Massachusetts Investors Growth; M.I.T. is Massachusetts Investors. But they were isolated instances. I think generally there is no confusion because the name is spelled out, the prospectus is clearly drawn out and each one states its objectives."

"The basis of the law of unfair competition and for the protection of trade-names is the avoidance of public deception and the prevention of one person trading on the goodwill of another person. As to the former, there will be no public deception or confusion between the two Funds. As to the latter, the manager and sponsor of Wellington Equity Fund is trading on its own goodwill and not that of any one else. The source of origin of the two Funds is identical."

Defendants recognize a corporation is entitled to protect its name and goodwill from encroachment by a subsequent user of a substantially similar trade name so long as there is a likelihood of public confusion or deception between the symbols of the two companies.[80] The law of unfair competition embraces the law of trade name and trade-mark infringement.[81] As observed by Nims in Unfair Competition and Trade-Marks, Vol. 1, at page 9:

"The relationship between the law of trade-mark infringement and the law of unfair competition was explained by Judge Denison in 1912 thus: 'The entire substantive law of trade-marks (excepting statutory provisions and construction) is a branch of the broader law of unfair competition. The ultimate offense always is that defendant has passed off his goods as and for those of the complainant.'"

And the applicability of this area of the law to corporate names was noted in American Steel Foundries v. Robertson:[82]

"* * * Whether the name of a corporation is to be regarded as a trade-mark, a trade-name or both, is not entirely clear under the decisions. To some extent the two terms overlap, but there is a difference more or less definitely recognized, which is, that, generally speaking, the former is applicable to the vendible commodity to which it is affixed, the latter to a business and its good will. * * * A corporate name seems to fall more appropriately into the latter class. But the precise difference is not often material, since the law affords protection against its appropriation in either view upon the same fundamental principles. The effect of assuming a corporate name by a corporation under the law of its creation is to exclusively appropriate that name. It is an element of the corporation's existence. * * * And, as Judge Deady said in that case:

"'Any act which produces confusion or uncertainty concerning this name is well calculated to injuriously affect the identity and business of a corporation. And as a matter of fact, in some degree, at least, the natural and necessary consequence of the wrongful appropriation of a corporate name, is to injure the business, the rights of the corporation by destroying or confusing its identity.'

"The general doctrine is that equity not only will enjoin the appropriation and use of a trade-mark or trade-name, where it is completely identical with the name of the corporation, but will enjoin such appropriation and use where the resemblance is so close as to be likely to produce confusion as to such

80. Def.Br. at pp. 32, 43–44; Section 32 (1) (a) of the Lanham Act prohibits use of a mark "likely to cause confusion" and the same test is generally used in unfair competition. Developments in the Law Trade-Marks and Unfair Competition, 68 Harv.L.Rev. 814, 862 (1955); in accord Coca-Cola Co. v. Nehi Corp., 1942, 26 Del.Ch. 140, 25 A.2d 364, 369.

81. See notes 29 and 30, supra, and accompanying text.

82. 1926, 269 U.S. 372, 380–381, 46 S.Ct. 160, 162, 70 L.Ed. 317.

identity, to the injury of the corporation to which the name belongs. * * * "

■ Contrary to defendants' assertions, plaintiffs have sustained their burden. As this Court recently observed in Old Charter Distillery Co. v. Continental Distilling Corp.[83] an action prosecuted under the Lanham Act:

"There is no need to seek a novel test for applying the statutory provisions for Judge Leahy in Telechron, Inc. v. Telicon Corp. enunciates an eclectic standard chosen from the prevailing authority:

" 'The test of "colorable imitation in commerce" suggested by the statutory prohibition is not an analytical difference between marks of two competing products when placed in juxtaposition, but whether a sensory difference will be recognized by the ordinary purchaser when he does not have the opportunity for comparison—i. e. whether a deceptive similarity exists when average buyer is unable to distinguish defendant's name or mark from his recollection of plaintiff's mark. Short of this, resemblance constituting infringement is incapable of exact definition. * * * '

"The test is essentially one to be applied by the court. Substantial similarity and not identity is all that is necessary to constitute an infringement. Proof of actual confusion is not required and when introduced is scrutinized carefully.

Evidence of a negative character such as testimony by the trade or by consumers that they are not deceived and that the respective marks do not cause confusion, is of doubtful value. A side by side comparison of the marks is afforded little weight for the products bearing the marks are rarely displayed that way in the commercial community."

■ In the instant case, the proof in favor of plaintiffs' position is overwhelming, notwithstanding defendants' expert testimony that the names "Wellington Fund" and "Wellington Equity Fund" were not likely to be confused in the trade.[84] The opinions of experts on the issue of likelihood of confusion is of questionable value.[85]

Subjecting these trade names to the traditional tests demonstrates conclusively the adoption of the name "Wellington Equity Fund" violates Wellington Fund's interest in its trade name. "Wellington" is the dominant feature of the two trade names. Wellington Fund is widely advertised as "A Name To Remember When Investing".[86] It is not uncommon in the industry for shares to be purchased by telephone and as the evidence reveals dealers and investors when they buy by telephone sometimes simply ask for Wellington shares.[87] Defendants' expert Clark, Vice-President of Calvin Bullock, Ltd. testified in his opinion Wellington Equity Fund had a more successful underwriting by reason of its employing the name "Wellington".[88]

83. D.C.D.Del.1959, 174 F.Supp. 312, 318–319.

84. N.T. 390, 420.

85. "Whether two trade-marks are confusingly similar is an issue of fact; it is, however, a question to be decided not by expert witnesses but by the court, and therefore it is a decision not based upon testimony but upon judicial opinion." 3 Callmann, The Law of Unfair Competition and Trade-Marks, 2nd Ed. § 82.3(b), pp. 1570–71.

" * * * Such witnesses are not experts; expert testimony on the question of similarity is not competent." Nims, Unfair Competition and Trade-Marks, Vol. 2, p. 1022.

86. DX 1, 2.

87. PX 7.

88. N.T. 366–367.

Likewise, defendants' expert Underhill, partner in the stock exchange firm of Arthur Wiesenberger & Company, publisher of the book "Investment Companies",[89] acknowledged that the underwriting of Wellington Equity Fund was made more successful by virtue of the existence and success of Wellington Fund.

It is properly inferrable from the record that defendants intentionally adopted the name "Wellington Equity Fund" to capitalize on the excellent reputation Wellington Fund enjoys with the investing public. The Red Herring Prospectus heralding the creation of the new fund contained the unique Wellington Fund oval[90] as did certain preliminary advertising.[91] Plaintiffs apprised defendants of this situation, and as a consequence, Wellington Equity Fund no longer employs the oval.[92]

Prior to the inauguration of Wellington Equity Fund, President Morgan circularized certain key members of his management and sales team seeking their comments and suggestions as to possible names for the new fund.[93] The name "Wellington Equity Fund, Inc." was included in the list sent by Morgan to these persons. The replies received by Morgan were candid expressions of supposedly knowledgeable persons in the mutual fund industry uninfluenced by any prospect of litigation. For this reason excerpts of the replies set forth below are entitled to consideration:[94]

"* * * [W]e certainly do not wish to use any name that would take away from the balanced fund." *Letter from Lawrence Connell*, of Boston, Mass.

"I don't believe either Wellington Corp. or shares would sufficiently distinguish the new fund from Wellington Fund." *Letter signed "Marty"*.

"* * * I suggest that in order to avoid any confusion in the investor's mind serious consideration be given to a title which does not use the Wellington name." *Inter-Office Memorandum from Robert J. Ogilvie, dated June 20, 1958.*

"Might the use of Wellington Fund and the new Wellington (name) be confusing to investors in a combination advertisement?"[95] *Inter-Office Memorandum from John Birmingham.*

"* * * I would go along with you on Wellington Shares, except that we very often have dealers call in an order for 'Wellington Shares' and I am afraid there might be some confusion." *Danforth Field Co. San Francisco.*

"We already speak of the Wellington Corporation, Wellington Shares, and Wellington Investors; and if the new Fund were to be given any of these names it might be rather confusing, especially on the telephone, trying to determine whether the party had holdings in the Old or the New Fund. Therefore I believe any of the following—Wellington Equities, Wellington Interna-

---

89. N.T. 404.

90. PX 19.

91. PX 31.

92. Letter dated September 4, 1958 affixed to Complaint as Exhibit A; N.T. 438.

93. PX 7.

94. Ibid. "* * * Expert testimony in this area is generally of questionable value, *though opinions of experienced advertising men trained in gauging public response to trademarks could well be relevant.* * * *" Developments in the Law Trade-Marks and Unfair Competition, 68 Harv.L.Rev. 814, 862 (1955). (Emphasis supplied).

95. Combination advertisements are in fact being placed in newspapers. DX 1.

tional, or Wellington General—can be used with the least confusion." *Joseph J. Gleason, Assistant Treasurer of Wellington Fund.*

"1. Would recommend that, if possible, name 'Wellington' be left out in order to avoid confusion with the present balanced fund.

"2. If, for sales purposes, Wellington should be included, I like Wellington Equity Fund best." *Note signed ETM*

The Court is cognizant investment dealers are responsible for nearly all sales of investment funds, and that the law requires a prospectus be delivered to the potential purchaser at the point of sale.[96] But as witness Shallcross testified, many persons who buy stock in investment companies do not read the prospectus.[97] Further at pages 614–615 of the notes of testimony Shallcross recognizes that a very considerable seg-

ment of the investing public are not informed investors and that many investors are prone to rely heavily upon the particular dealer or representative who deals with them.

The Court is mindful the stated aims of Wellington Fund differ in some respect from the objectives of Wellington Equity Fund.[98] The two Funds do, however, directly compete at least to a limited extent, notwithstanding the testimony of defendants' experts to the contrary. Common stocks comprise approximately 70% of Wellington Fund's investments. The same securities appear in the portfolios of the two Funds.

President Morgan in his examination acknowledged that over the years Wellington Fund has engaged in keen competition with Massachusetts Investors Trust, a stock fund.[99] The declared basic goal of Wellington Equity Fund is listed as one of three stated principal

96. N.T. 630.

97. N.T. 606.

98. "All of the witnesses called by the Defendants testified that there were certain different basic needs or desires of investors which their investments might serve for them. These basic needs and desires can be summarized as follows:
"1. Conservation of principal and income.
"2. Development of income.
"3. Long term growth of principal and income.
"4. Speculation.
"The objectives of Wellington Fund are 'conservation of principal, reasonable income return and profits without undue risks' (Prospectus, P. Ex. 22). This is commonly called a balanced fund because it attempts to provide some of each of the first three basic needs or desires of investors referred to above. * * *
"The objective of Wellington Equity Fund is long term growth of capital and income (Prospectus, P. Ex. 20). This Fund is concerned only with the third basic need or desire of investors referred to above, and is commonly called a growth fund. * * *" Def.Br. pp. 33–34.

"But note following excerpt from page 24 of DX 4, Arthur Wiesenberger's book entitled, "Investment Companies":
"Criteria of a Good Investment"
"Any investor will be happier and more prosperous to the extent that his investments:
"1) maintain over the long term the original capital value of his investment in terms of purchasing power of currency;
"2) return a reasonable and continuous income; and
"3) display long-term growth of capital value and income.
"Common stocks have proved superior to other forms of investment precisely because they have delivered these three requirements to more people in greater measure than any other method of investing capital. This statement is true whether applied to broad periods of deflation or inflation."

99. N.T. 556. "In practice, it is sometimes difficult to draw a precise line between Balanced Funds and Common Stock Funds. Many mutual funds are clearly one type or the other, but there are also companies that fit neither classification in all respects. * * *" Wiesenberger's Investment Companies, 1959 Ed. DX 4, p. 114.

objectives of Wellington Fund.[100] Expert Shallcross on cross-examination stated that he would not recommend a balanced fund unless the prospective purchaser insisted. The pertinent questions and answers follow:[101]

(Shallcross) " * * * I have a reservation about any balanced fund, not only Wellington. I personally won't own bonds or preferred stocks, and I don't like to recommend them to other people. If they

100. A ten year comparison (Jan. 1, 1949–Dec. 31, 1958) of the results of Wellington Fund with the results of a stock Fund herein referred to as "X Stock Fund", with purportedly the same objectives as Wellington Equity Fund demonstrates that an equity or stock Fund is capable of fulfilling not only the declared basic goal of a stock Fund—long term growth of capital and income— but is also capable of out performing a balanced fund with respect to the objectives that are supposedly peculiarly within the balanced Fund's domain— conservation of principal and income.

The following tables, comprising data excerpted from the 1959 edition of the book entitled, "Investment Companies" (DX 4), summarize the results of a hypothetical purchase of $10,000 worth of shares in Wellington Fund and "X Stock Fund" for the period January 1, 1949–December 31, 1958, under two sets of circumstances. The first table traces the results of a hypothetical $10,000 investment for the two Funds predicated upon the assumption that the investor elected to receive all dividends and capital gains distributions in cash. The second table shows the growth of the $10,000 investment for each Fund under the assumption that the investor chose to accept all dividends and capital gains distributions in stock of the particular Fund.

### Table 1

Results Taking All Dividends
And Distributions In Cash

| | Wellington * Fund | X Stock Fund ** |
|---|---|---|
| Initial investment at offering price, Jan. 1, 1949 | $10,000 | $10,000 |
| Total value Dec. 31, 1958 | 15,613 | 32,292 |
| Distributions from Securities Profits | 3,459 | 5,714 |
| Dividends from Investment Income | 4,713 | 4,718 |

 * DX 4 at p. 228
 ** DX 4 at p. 197

### Table 2

Results Taking All Dividends
And Distributions In Stock

| | Wellington * Fund | X Stock Fund *** |
|---|---|---|
| Initial investment at offering price Jan. 1, 1949 | $10,000 | $10,000 |
| Total dividends from income reinvested | 6,495 | 6,350 |
| Total amount invested | 16,495 | 16,350 |
| Total value Dec. 31, 1958 | 29,698 ** | 55,637 **** |

 * DX 4 at p. 228
 ** Includes total value of $6,015 capital gains distributions accepted in additional shares.
 *** DX 4 at p. 197
 **** Includes total value of $7,495 capital gains distributions accepted in additional shares.

———◆———

101. N.T. 612.

want that sort of thing, if they are timid, if they feel that is their answer to being conservative and I can't give them an education to what happens to money, then I am going to let them have the best balanced fund I can, and I think that is the case in which I recommend Wellington.

"Q. Do you try to educate people away from balanced funds? A. I certainly do. Any chance I have to get them away from a balanced fund into a stock fund, I do it."

It is clearly this expert's opinion that an investor with objectives best suited for a balanced fund can have his investment desires fulfilled by a stock fund.[102]

■ Even if these two Funds did not compete in any manner, Wellington Fund would still be entitled to have its name protected. In Standard Brands v. Smidler,[103] the prior user of the trademark V-8 affixed to a vegetable juice was held deserving of protection against the use of the same symbol on dry vitamin tablets; for "if protection were denied, the owner would later be unable to use his old mark in the second user's product field." [104] Judge Chase writing for the majority stated: [105]

"The protection which the law gives the owner of a trade-mark is not confined to the goods upon which it is, or has been, used by the owner of it but extends to products which would be reasonably thought by the buying public to come from the same source if sold under the same mark. (Citing cases.) His mark is the brand by which his goods can be identified, and when it is used by another the reputation of his mark, and consequently his own business reputation, are placed to that extent beyond his control. Unless the use by that other is upon goods so unlike his own or in territory so far from that which he has exploited that it will not create confusion it will be enjoined. * * *

"The court below found on adequate evidence that the defendant's use of 'V-8' was 'likely to confuse purchasers or mislead them into the belief that defendant's product is in fact manufactured by plaintiff.' Products so closely related in use would naturally be thought to have the same source when they bear the same mark. They are as closely connected as the fountain pens and razor blades of the L. E. Waterman Co. case, supra, or the flashlights and locks of the Yale Electric Corporation case supra, if not more so. * * *

"What has been said respecting infringement applies as well to the cause of action for unfair competition, which is but a somewhat broader phase of the same wrong. The gist of this action is the likelihood that the goods of the defendant will be passed off as those of the plaintiff. * * *

"The court below did not find specifically that the trade-mark in suit was commonly known to be the plaintiff's mark, but its ownership of it was proved and so was the likelihood that its use by the defendant would cause his goods to be purchased in the belief that their source was the same as that of the plaintiff's vegetable juice cocktail. That made its use by the defendant unfair and unlawful competition with the plaintiff. It was enough that an appreciable number of prospective purchasers were likely to be thus misled. * * * *And it is immaterial that vegetable juices and vitamin tablets do not directly compete with each*

---

102. See note 100, supra, as substantiation of the Shallcross observation.

103. 2 Cir., 1945, 151 F.2d 34.

104. Developments in the Law Trade-Marks and Unfair Competition, 68 Harv. L.Rev. 814, 896, fn. 587 (1955).

105. 2 Cir., 1945, 151 F.2d 34, 37.

*other.* \* \* \*" (Emphasis supplied.)

Wellington Fund is a balanced Fund which means its portfolio consists of common stocks together with preferred stocks and bonds, and is consequently conservative in outlook.[106] Expert Shallcross in his testimony painted a dismal future for balanced funds in view of their insistence to retain bonds and preferred stocks in their portfolios. He testified, "today the common stock type of Fund I think is the thing." [107] And more important he observed, "there has not been, so far as I know, a new balanced fund set up for at least five years." [108] Shallcross concluded from the aforementioned observations: [109]

"I think the conclusion is this: That Wellington, having a balanced fund, could conceivably, within the next few years, if not earlier, run into a diminishing demand for its shares, which might at a point get to a situation where periodically they would lose shares on balance—I mean by that, where the redemptions which the shareholders would make could exceed the sales. And at that point we would be going in the wrong direction. And the minute that happens in a Fund, I can tell you from experience the dealers around the country are watching like hawks to see that happen, and when it does they begin to desert the ship. There will be liquidations piled up; the loss of shares can begin to accelerate; and finally, in the case of Wellington, you could reach a point where they could get down to a level in their dollars outstanding where the management fee would go back to the previous figure. I could see where there could be a very serious situation arise in the next several years."

Shallcross stated the situation he depicted might be alleviated by having the managers of Wellington Fund promote a stock fund: [110]

"On the other hand, if the managers of Wellington are able to capitalize on the new situation that exists today, by having a stock fund in existence, and by promoting the sale of that, they can preserve their economic strength. And to me that is the most important thing to any mutual fund shareholder. If you don't have a sound and well financed sponsor company, making money on its efforts and able to afford to hire a battery of analysts of the caliber that are required, then I think the mutual fund holder is losing out if he doesn't make sure that he gets that and continues to have it."

■ The Shallcross solution simply does not come to grips with the problem. It would be unfair to Wellington Equity Fund to siphon off its management fees to meet expenses of Wellington Fund not covered by its management charge, in the event the situation portrayed by Shallcross develops. Especially, would the inequity be compounded where as in the instant case, separate corporate entities manage the respective funds. But even of greater significance, if the crisis as noted by the witness occurs, the existence of the Equity Fund would, in fact, worsen the plight of Wellington Fund. If the times compel modification in investment objectives then Wellington Fund would be forsaking its shareholders if it chose not to accede to the changing times. The appropriate solution must be, of necessity, alteration of the portfolio complexion. If the circumstances warranted, with the requisite approval of the shareholders,[111] it perhaps would be appropriate for Wellington Fund to become exclusively a stock fund.

106. N.T. 239–240.

107. N.T. 597.

108. N.T. 597–598.

109. N.T. 598.

110. N.T. 598–599.

111. 15 U.S.C.A. § 80a–13; 15 U.S.C.A. § 80a–8(b) (2).

This transformation could not be effectively accomplished so long as there existed a stock fund bearing the dominate feature of the trade name, "Wellington". The doctrine enunciated in Standard Brands v. Smidler,[112] is thus particularly appropriate, for if Wellington Fund were today denied injunctive relief it would be precluded from later using its trade name in the second user's field. The answer is not as might be suggested at first blush for the potentially harmed investor to liquidate his Wellington Fund holdings and invest those monies in Wellington Equity Fund. Liquidation would invoke possible tax inequities in addition to the load charge exacted by the distributor of Wellington Equity Fund shares. The investor might be one who has contracted under a long range prepaid charge accumulation investment program,[113] in which case, the sales charge for the entire program is paid in the first years of the plan.[114] The investor, particularly the investor of modest sums, could not without great economic sacrifice withdraw from the one Fund and buy in the second.[115] The shareholders of Wellington Fund have the right to insist that their directors engage investment advisory services which will keep Wellington Fund's portfolio attuned to the times and that the directors do not divert from Wellington Fund the valuable corporate opportunity of employing the Wellington trade name in exclusively common stock activity. Anything less, would be a serious breach of the fiduciary responsibility owed by the directors to the Fund's shareholders.

■■■ Defendants' case is not advanced by their position that no confusion as to source can arise because "the source of origin of the two Funds is identical." [116] Contrary to defendants' contentions the source or origin of the name "Wellington" is not the investment adviser nor is it the distributing company but can only be Wellington Fund. The shares of Wellington Fund are not boxes of Kleenex and should not be considered as the product of the distributor or the adviser. Wellington Fund is a

112. Note 103, supra.

113. Wellington Fund offers two types of accumulation programs, namely, level charge and prepaid charge. Wiesenberger, Investment Companies, 1959 Ed. pp. 227, 245, 246.

114. " * * * The Prepaid Charge plan, so-called because the principal deductions for issuance and sales expenses are made in the first year or two, is also known as the Contractual, Penalty, or 'front-end-load' plan. This method of deducting sales costs mainly during the first year or two is the same as that generally followed in the sale of life insurance." Id. at p. 119.

115. "Assuming that a Prepaid Charge plan is carried through to completion, the total costs involved may be somewhat more, about the same as, or even lower than on a Level Charge plan. Fees on Prepaid Charge plans are generally scaled downward as the monthly payment increases. The investor with $250, or more a month to invest may find the total fees lower on a Prepaid than on a Level Charge plan. *For monthly payments under $100, the fees on a Prepaid plan in most cases are appreciably higher.*" Id. at p. 121. (Emphasis supplied.)

"The main attraction for these sales crews is the contractual plan for accumulating mutual-fund shares. Under these plans the customer signs up to buy shares of a mutual fund in regular monthly or quarterly payments over a period of ten or more years. The bait for the salesmen is that the SEC allows half the first year's payments to be deducted as a sales Commission (the so-called 'front-end-load'), and enough from the following years for a 9 per cent maximum commission. For example, from selling a contractual plan that calls for payments of $1,000 in the first year, the sales organization can keep $500 toward the commission; however, if the accumulation plan is voluntary the salesman gets only $90 the first year. The penalty on an investor who drops a contractual plan in its early years is very heavy, and the incentive to the salesman to sign him up on a contract is very high." Bookman, "How Good Are Mutual Funds", Fortune Magazine, June 1960, p. 190.

116. Def.Br. p. 44.

corporation and its shares represent the corporation's capitalization. When one invests money into the Fund he has the expectation the directors will see that his money is wisely invested. The Board of Directors as is the practice in some investment companies, may choose to have the advisory [117] and sales functions [118] carried on by the Fund itself. On the other hand, the Board of Directors may adopt the prevalent practice in the industry and contract to competent knowledgeable persons the distribution and investment advisory roles, retaining, however, "watchdog responsibility" over the conduct of these functions.[119] In either instance, control is lodged in the Fund's directors who are ultimately responsible to the shareholders. If defendants' suggestion be adopted, namely, the shares of stock in an investment company represent nothing more than the commercial product of the investment adviser or distributor, the corporate concept would receive a serious setback. The law is not ready to assimilate the sophisticated nuances advanced by defendants. Nor should the investing public have its rights determined by concepts so foreign to established principles.

The Court is aware of the public and private interests afforded protection by the law of unfair competition. In Old Charter Distillery Co. v. Continental Distilling Corp. this Court, after observing the dimensions of the legitimate public interests served remarked,[120] "it is the interests of private litigants founded upon basic economic and social concepts, that are accorded the principal protection. Mr. Justice Frankfurter has stated the owner of a mark is entitled to protection against one poaching upon the 'commercial magnetism of the symbol he has created.'"

## III.

Defendants assert, "The creation and continued existence of Wellington Equity Fund have not, and will not, damage Wellington Fund, but have been, and will be, of advantage to Wellington Fund." [121]

Contrary to the arguments of defendants, Wellington Equity Fund reaps more benefit at the present time from the existence of Wellington Fund than does Wellington Fund from the existence of Wellington Equity Fund. The principal reason Wellington Equity Fund had a successful initial underwriting was because of the tremendous reputation Wellington Fund enjoys among the investing public.[122] Wellington Equity Fund has inherited a vast efficient distribution network, developed over many years, made

117. N.T. 374. The following Mutual Funds provide their own investment advisory services:

| | |
|---|---|
| Blue Ridge Mutual Fund, Inc. | Wiesenberger, Investment Companies, 1959 Ed. p. 144 |
| Broad Street Investing Corporation | Id. at p. 146 |
| Century Shares Trust | Id. at p. 148 |
| Corporate Leaders Trust Fund Certificates, Series "B" | Id. at p. 156 |
| Investment Trust of Boston | Id. at p. 184 |
| Life Insurance Investors, Inc. | Id. at p. 194 |
| Massachusetts Investors Growth Stock Fund, Inc. | Id. at p. 197 |
| Massachusetts Investors Trust | Id. at p. 198 |
| National Investors Corporation | Id. at p. 203 |
| Whitehall Fund, Inc. | Id. at p. 229 |

118. Note 72, supra.

119. N.T. 374.

120. D.C.D.Del.1959, 174 F.Supp. 312, 326. "Although the test for determining consumer deception is couched in terms of likelihood of public confusion, the public interest is not the primary rationale behind trade-mark protection." Ibid.

121. Def.Br. p. 45.

122. Notes 88, 89, supra, and accompanying text.

possible only by virtue of the existence of Wellington Fund. The investment advisory staff which was exclusively supported and nurtured by the management fees exacted from Wellington Fund now deploys its talents in managing Wellington Equity Fund's portfolio.

Since there exists at least limited competition between the Funds, some of the investing monies that have gone into the treasury of Wellington Equity Fund would have been available for purchase of Wellington Fund shares. The management fee payable by Wellington Fund to Wellington Management Company is scaled downward. The fee is computed as follows: At annual rate of ½ of 1 per cent on the first $70 million of average net assets, ⅜ of 1 per cent on the next $50 million and ¼ of 1 per cent on average net assets over $120 million.[123] Wellington Fund, because of its size, pays the minimum net asset charge, hence each additional investor's dollar reduces the distributable management costs. Any saving effectuated by reducing the composite management fee would not be, however, appreciable when allocated on a per share basis.

■■■ The real harm to Wellington Fund is that the creation of a stock fund bearing the name "Wellington" for all practical purposes excludes any chance of Wellington Fund entering into the field. Defendants recognize that a prior user has a legitimate interest to exclude the use of any symbol the prior user has created into fields the owner of the symbol might reasonably be expected to explore:

"The field of activity in which trade-name protection will be afforded is dependent upon likelihood of confusion. Where goods or services are competitive, they are obviously in the same field of activity. The owner of a trade-mark or trade name is also entitled to protection with respect to non-competing goods or services to the extent that they are in fields into which the owner might reasonably be expected to expand. In such situations use of a similar trade-mark or trade-name by a second user in these related fields is likely to lead the public to believe that the goods or services come from the original owner of the mark or name." [124]

■■■ Not only is there injury to Wellington Fund by reason of Wellington Equity Fund preempting a large segment of the investment company field but, in addition, there is a built-in conflict of interest that is created. The conflict is threefold. To begin with, since the Boards of Directors of the two Funds are interlocking,[125] the directors, when acting on behalf of Wellington Equity Fund would naturally tend to resist any suggestion of altering Wellington Fund's portfolio that would in effect make Wellington Fund a common stock fund, and thus a competitor of their other master, Wellington Equity Fund. Hence, if the events as predicted by expert Shallcross were to come to pass, the board members would be placed in a dilemma. A decision to enter into the common stock field would create competition with Wellington Equity Fund. A determination not to enter would mean that the assets of Wellington Fund would waste away. It is simply not fair to the shareholders of the two Funds, or, for that matter, to the directors to have their corporations exposed to such conflict.

The investment advisory group by virtue of managing two Funds bearing substantially similar names is constrained to maintain distinctions in the portfolio posture of the respective Funds in order that the two Funds may be distinguishable in the eyes of the investing public.

123. Wiesenberger, Investment Companies, 1959 Ed. p. 228.

124. Reply Brief of Defendants Sur Request For Findings of Fact And Conclusions Of Law (hereafter referred to as Def.Rep.Br.), p. 10.

125. All eleven members comprising the Board of Directors of Wellington Equity Fund are members of Wellington Fund's thirteen member Board. PX 20, 29.

The inflexibility engendered by this limitation is incompatible with the shareholders' best interests. The distinguishing characteristics of the security under consideration for purchase should play no part in investment selection.

Similarly, the underwriter in offering the shares of two Funds, having substantially similar names, must be careful the objectives of the two Funds are significantly differentiated in the advertising and programming literature. The restrictions thus placed upon the activity of Wellington Fund are unwarranted.

Defendants appreciate the balanced Fund is presently engaged in a fight for its very existence.[126] It is all the more reason Wellington Fund deserves to have its name and the public image it has created insulated from expropriation. The directors, advisory group and underwriter are in no position to meet the challenge so long as Wellington Fund, by virtue of the existence of Wellington Equity Fund, is precluded from achieving its maximum investment and distribution potential.

Defendants' allowance of a larger concession to dealers for sales of Wellington Equity Fund than allowed for sales of Wellington Fund shares during the initial offering of Wellington Equity Fund is additional conduct evidencing unfair competition,[127] but since the practice has been discontinued, is of little consequence.

### IV.

The minute of the meeting of the Board of Directors of Wellington Fund for September 25, 1958 contains the following resolution: [128]

"Resolved, That the Board continues to be of the opinion that the use of the name 'Wellington Equity Fund, Inc.' by that Corporation in connection with its common stock fund is in the best interests of Wellington Fund, Inc.,

"Further resolved, That the prior action of the Board and of the officers in approving the use of the name 'Wellington Equity Fund, Inc.' by that Corporation as a common stock fund is hereby formally reaffirmed, ratified and approved;

"Further resolved, That the proper officers of this Corporation be, and they hereby are, authorized to execute and deliver, in the name of this Corporation, to Wellington Equity Fund, Inc., any instruments of license, consent or approval which may be necessary or advisable, in their sole discretion, to evidence the approval of this Corporation, whether or not such approval may be required, of the use by Wellington Equity Fund, Inc., of that name."

Defendants urge this approval was granted by the directors in the exercise of sound business judgment: [129]

"Plaintiffs offered no evidence tending to refute the conclusion of the directors that the use of the name would be of advantage to Wellington Fund. Defendants' evidence, previously reviewed, abundantly establishes that there are very substantial advantages to Wellington Fund flowing from the existence of Wellington Equity Fund and its use of the name 'Wellington', and that the Wellington Fund directors exercised sound judgment from the standpoint of Wellington Fund in granting their approval."

 At best, the corporate resolution granting Wellington Equity Fund the right to use the name "Wellington" can be deemed nothing more than the gift of a valuable corporate asset. In evaluating this action of Wellington Fund's Board of Directors Delaware law applies.[130] Delaware adheres to the well settled common law principles of corporate law that "directors have no power

---

126. Def.Br. pp. 48, 49, 50–51.

127. Answer, Par. 13.

128. Joint Ex. 1, Document 11c.

129. Def.Br. pp. 72–73.

130. Perlman v. Feldmann, 2 Cir., 1955, 219 F.2d 173, 175, 50 A.L.R.2d 1134.

to give away corporate property",[131] and that a gift of corporate assets requires unanimous stockholder approval. In Frankel v. Donovan, Vice Chancellor Marvel determined the applicable Delaware law in this respect to be: "Gifts of corporate assets except as authorized by § 122(9) of Title 8, Del. C. require unanimous stockholder approval. The cited section of the Delaware Corporation law permits corporations to 'Make donations for the public welfare or for charitable, scientific or educational purposes.'"[132]

▇▇▇ Defendants allege Wellington Fund was compelled by the circumstances to give its consent to Wellington Equity Fund for the use of its name:[133]

"The shares of Wellington Fund are sold to the public by investment dealers who are the veins and arteries through which the life blood of the Fund flows. These very dealers whose goodwill and satisfaction is vital to the continued growth of Wellington Fund were insisting for at least two years that the Wellington Company make a common stock fund available for sale through them. Failure to comply with this demand might well have resulted in dealer dissatisfaction with Wellington Fund (Welch, p. 450) and it would have been foolhardy for the Wellington Fund directors *not* to have given the full assent and approval of Wellington Fund to whatever extent was necessary."

There is not one shred of evidence in this record that the dealers' insistence on a common stock fund also included a plea that the proposed Fund bear the Wellington name. It is one thing to state that the times required entering new fields of investment but the naming of the new endeavor is an entirely different proposition. The record does not support defendants' implication that the creation of a new fund must necessarily carry the Wellington name.

There is no question, very real advantages accrued to certain corporations and individuals by virtue of affixing the name "Wellington" to the new stock Fund. Unfortunately, Wellington Fund was not the recipient of any discernible benefit.

The stockholders of Wellington Fund were never afforded the opportunity to pass upon the directors' action approving the use of the "Wellington" name by a separate and distinct corporate entity. That the directors of the two Funds are the same with but two exceptions[134] is an additional reason for determining that the approval was, at the least, suspect.

This Court has already concluded, the use of the name "Wellington" by Wellington Equity Fund is detrimental to Wellington Fund. The directors purported conveyance of the right to use the name "Wellington" was without adequate consideration and must accordingly be deemed null and void.

## V.

As a separate and perhaps inconsistent defense with the others previously considered, defendants submit:[135] Wellington Fund is not the owner of trade name rights in the name "Wellington", A, because it was not the first to use the name in this field; B, because it acquired the name only by the consent and license from the predecessor to the Wellington Company; and, C, because it has not had the exclusive use of the name in this field.

## A.

▇▇▇ Defendants initially contend Wellington Fund was not the first user, and thus not entitled to enjoin one attempting to purloin the public image Wellington Fund has created. Wellington Equity Fund adopted the name "Wellington" because of the tremendous suc-

---

131. Fletcher, Cyclopedia Corporations, Vol. 2, § 520, p. 580.

132. Ct. of Chancery, Del.1956, 120 A.2d 311, 312, fn. 2.

133. Def.Br. p. 73.

134. Note 125, supra.

135. Def.Br. p. 1-a.

cess and reputation Wellington Fund has enjoyed with the investing public since 1928. "Wellington Fund" is a strong mark and has acquired a secondary meaning. It has been widely alluded to as "A Name To Remember When Investing".[136] In no way, can the public image created, be traced to the closely held advisory and management companies lurking in the background that also employ the "Wellington" name. Wellington Fund is registered under the Investment Company Act of 1940.[137] No registration under the Investment Company Act has been filed by, or on behalf of, any entity bearing the name "Wellington" other than Wellington Fund, Inc.; Wellington Equity Fund, Inc.; and Wellington Foundation.[138] Wellington Foundation incorporated May 21, 1935 was consolidated with First Investors Corporation on January 11, 1951.[139] Its function while operating was to sell the shares of Wellington Fund on a subscription basis known as the contractual plan.[140]

The record supports a single conclusion, namely, Wellington Fund is the legal owner of its name. But even if Wellington were denied proprietary interest in its name "equity will grant relief though the wronged plaintiff does not have an exclusive property right in that name. * * * [W]here the trade name of another concern is adopted apparently to take advantage of that concern's good will."[141] In the instant case, it is clear Wellington Equity Fund intended to poach "upon the commercial magnetism of the symbol."[142]

### B.

■■■ Defendants contend Wellington Fund acquired its name "only by the consent and license from the predecessor to the Wellington Company."[143] Defendants concede no license or consent appears in writing. Nor is it discernible from the record when this so-called license became operative. The presumption is, a corporation owns its name,[144] and the party asserting the contrary risks the burden of nonpersuasion. Not only have defendants not sustained their burden of proving an oral license but the evidence is to the contrary. Wellington Fund, incorporated in 1928, has been using the name "Wellington" in the investment company field since 1935.[145] At no time prior to the instant action has there been any such assertion that Wellington Fund merely has a nonexclusive license in the use of its name. The purported licensor did not speak up in September, 1958[146] and relate to the board of directors of Wellington Fund that there was no need for Wellington Fund to consent to the use of the name "Wellington" by Wellington Equity Fund since Wellington Fund merely held a nonexclusive license to the name. The purported licensor knows full well how to go through the motions of creating a license. This is demonstrated by the following provision appearing in Wellington Equity Fund's Certificate of Incorporation: [147]

> "The corporation [Wellington Equity Fund] acknowledges that it has obtained its corporate name by consent of The Wellington Company and agrees that if at any time the said The Wellington Company and/or an affiliate or a successor to the interests thereof (whether such succession be by merger, consolidation, purchase of assets, or other-

136. Note 86, supra.

137. Stipulated Fact No. 5.

138. Stipulated Fact No. 19.

139. Joint Ex. 1, Item 1.

140. N.T. 540.

141. Perfectform Corp. v. Perfect Brassiere Co., 3 Cir., 1958, 256 F.2d 736, 741–742.

142. Mishawaka Rubber & Woolen Mfg. Co. v. Kresge Co., 1942, 316 U.S. 203, 205, 62 S.Ct. 1022, 1024, 86 L.Ed. 1381.

143. Def.Br. p. 1–a.

144. Nims, Unfair Competition and Trademarks, Vol. 1, p. 138 (1947).

145. Joint Ex. 1, Item 1.

146. Note 131, supra.

147. Stipulated Fact No. 7.

wise) ceases to be the investment advisor of the Corporation (Wellington Equity Fund) and national distributor of its shares, it shall at the written request of said The Wellington Company and/or such affiliate or successor change its name so that no reference therein shall be contained to 'Wellington', 'Morgan', 'Claymont', or 'Locust Street'."

Defendants now suggest the Court imply a charter provision that will have the effect of depriving 262,000 shareholders of a valuable corporate asset. It would be unconscionable for any court, especially one required to apply the traditional principles of equity to deprive Wellington Fund shareholders of the name of their company on the meager showing made by defendants. To the contrary, the Court is impelled to remove any cloud that might exist as to the ownership of this renowned name in the investment company industry. Accordingly, the Court concludes that Wellington Fund has the exclusive right to use its corporate name as owner, and not as a nonexclusive licensee.

### C.

 Defendants on this point finally suggest Wellington Fund has "not had the exclusive use of the name in this field." [148]

Until entry into the field by Wellington Equity Fund in 1958, Wellington Fund has had the exclusive continuous use of the "Wellington" name in the investment company arena since 1935.[149] Defendants' use of the name has been primarily in conjunction with investment advisory and underwriting services.[150] The public's contact with the name "Wellington" has almost exclusively been with Wellington Fund. In fact, this Court was surprised when two of defendants' expert witnesses, particularly knowledgeable in the investment company field, could not name Wellington Fund's investment adviser.[151] No greater knowledge can be imputed to the investing public. Further evidence "Wellington Fund" is the trade name that has achieved public acceptance and that the noninvestment companies bearing the "Wellington" name are little known to the investing public is borne out by the many corporate changes in name and in function that the noninvestment companies have undergone.[152]

Investment companies and investment advisers are not controlled under the same statutory scheme. Investment companies come within the jurisdiction of the Investment Company Act of 1940,[153] whereas investment advisers are controlled by the Investment Advisers Act of 1940.[154] Thus, Congress has recognized that the two fields are separate and distinct even to the extent of requiring specially tailored statutory enactments.

The Court is in complete accord with defendants' statement of principle that the "owner of a trade-mark or trade name is also entitled to protection with respect to noncompeting goods or services to the extent that they are in fields into which the owner might reasonably be expected to expand." [155] Defendants at this late date, simply have no standing to invoke the doctrine. Wellington Fund has occupied the investment company field since 1935 with the complete knowledge of Wellington Company and its successors. It would be a perversion of the doctrine to now allow Wellington Company to enter the investment company field with the name "Wellington" after the field has been exclusively occupied for some 23 years by Wellington Fund. It would permit Wellington Company to reap a windfall which it does not deserve. For defendants to suggest that the Court so find is an admission on defendants' part that the interests of Wellington Fund are secondary, and those of the

---

148. Def.Br. p. 1–a.

149. Joint Ex. 1, Item 1.

150. Note 153, infra.

151. N.T. 178–179, 404.

152. Joint Ex. 1, Item 1.

153. 15 U.S.C.A. § 80a–1 et seq.

154. 15 U.S.C.A. § 80b–1 et seq.

155. Def.Rep.Br. p. 10.

closely held management and distributing companies paramount, notwithstanding, that the principals in control of these closely held companies occupy positions requiring the exercise of the highest degree of fidelity to Wellington Fund.[156]

The sole conclusion to be gleaned from the record is that Wellington Fund has had exclusive use of the name in the realm of investment companies.

■ Defendants at various stages of the proceedings have advanced two other theories, requiring in their estimation, the entry of a verdict for defendants, namely, the related company concept [157] and some form of an estoppel. The Court is unable to discern which companies under defendants' reasoning are related. If defendants contend that only Wellington Company and Wellington Equity Fund are related, then this doctrine, having its roots in the law of licensing, would be nothing more than the rankest type of bootstrapping. Likewise, defendants' position is not strengthened if the two Funds together with the distributing and advisory companies be deemed for defendants' purposes related companies. The doctrine is not designed to lessen or diminish the rights of any member of the corporate complex inter se, but is for the purpose of insulating products bearing similar or identical trade names or trade-marks of closely associated companies from attacks by strangers.[158] It would be a frustration of the concept to hold that a corporation may invoke the principle to limit the rights of a purported sister corporation. The doctrine simply has no application to the facts at hand.

■ With respect to invocation of an estoppel, the Court concludes defendants have failed to sustain their burden.

■ Plaintiffs, in addition to seeking a determination that Wellington Fund has exclusive rights to the name "Wellington" in the investment company field, request the Court declare Wellington Fund entitled to the exclusive services of its investment adviser. As previously stated, a conflict of interest necessarily arises where a single investment adviser manages the portfolios of two investment companies bearing the same, or substantially similar names. Plaintiffs contend a potential conflict is created when one investment adviser manages more than one investment company. In support of the allegation plaintiffs cite certain instances where it would be impossible for the adviser to act without harming one or the other companies under its management. For instance, plaintiff poses a situation of two investment companies each owning a large block of a rapidly declining security where the market can only absorb a certain percentage of the total number of shares at a favorable price. Defendants have devised a formula for dealing with the purchase of portfolio securities of the two Funds:

"B. In the ideal situation, where both Funds are in the market for a given quantity of stock at the same time, the executions, day by day, should be allocated in the ratio of the total initial orders; e. g. if Wellington Fund wants 9,000 shares in total and Equity Fund 1,000 shares in total, then each day's executions should be prorated nine to one, such proration to cover both shares pur-

---

156. Perlman v. Feldmann, 2 Cir., 1955, 219 F.2d 173, 175.

157. Keebler Weyl Baking Co. v. J. S. Ivins' Son, Inc., D.C.E.D.Pa.1934, 7 F. Supp. 211, 214; 15 U.S.C.A. § 1055.

158. Browne-Vintners Co. v. National D. & C. Corp., D.C.S.D.N.Y.1957, 151 F. Supp. 595.

"I can see no imposition upon the public, no abandonment, and no other element which impairs a trade-mark right when the corporation which owns it, which in turn is owned by a general control, permits other corporations under the same general control to use the mark upon an identical product which they produce in accordance with the owner's directions and instructions." Keebler Weyl Baking Co. v. J. S. Ivins' Son, Inc., D.C.E.D.Pa.1934, 7 F.Supp. 211, 214.

chased and the price of shares purchased." [159]

It is presumed the same formula would be applied to sales of securities. Plaintiffs urge in the event it is determined to liquidate a particular portfolio security, Wellington Fund should be entitled to have disposed as many of its shares as the market will absorb and not have to depend upon the vagaries of an arbitrary formula.

■■■ Plaintiffs are correct in their assessment of the degree of fidelity and loyalty owed by the investment adviser to Wellington Fund. Their demands, however, at this time are premature.

Defendants by undertaking to manage two separate corporate Funds have exposed themselves to conflicting obligations and pressures. If any duty owing either Fund is breached, a suitable remedy will be available to the innocent and injured persons. The conflict as outlined by plaintiffs, if one should occur will have to be judged in the setting in which it arises. The Court is not prepared at this time to declare it is a per se conflict of interest for one adviser to manage two Funds bearing dissimilar names. At this stage a caveat is all that the Court can provide.

■■■ Plaintiffs' contention the investment advisory contract should be construed as providing for exclusivity of services simply has no foundation in the record. Accordingly, plaintiffs will be denied relief on this ground.[160]

### Federal Causes of Action

The identical acts giving rise to the common law causes of action are asserted as violative of the Securities Act of 1933,[161] the Securities Exchange Act of 1934;[162] the Investment Company Act of 1940[163] and the Federal Trade Commission Act.[164] The federal claims, stating causes of action under the laws of the United States are well founded, and were not asserted merely to create juris-

---

159. PX 13.

160. A questionable industry practice came to the Court's attention during the cross-examination of a defendants' investment broker witness. Apparently it is an industry wide practice for investment advisers managing more than one Fund to place orders with a broker for the purchase and sale of securities of one Fund to pay off for services rendered by the broker to other Funds under the investment adviser's management. (N.T. 608, 630–632). The investment adviser of Wellington Fund indulges in the above conduct. (N.T. 608, 630–632). The propriety of this practice is open to question. However, the matter in its present posture, lacking in specificity, and transcending the contested issues, is outside the realm of judicial sanction, here, but peculiarly within the investigative purview of the appropriate administrative authorities. Cf. following comments of George B. Bookman in his article entitled, "How Good Are Mutual Funds?", June 1960 issue, Fortune Magazine, p. 185:

"Reciprocal brokerage

"There is another aspect of the mutual funds that is controversial: namely, the relations of the management companies with brokers. Mutual funds create very substantial brokerage commissions when they buy and sell securities, as they are constantly doing. In a year's time, when turnover in portfolios is moderately active, a big billion-dollar fund can generate brokerage commissions of more than $2,500,000. Brokers have come to expect a part of these commissions in return for selling shares of the funds, in addition to the usual sales commission.

"There is nothing illegal about this practice of 'reciprocal brokerage', as it is called. But, it can result in a kind of payola. The funds face constant pressure from brokers for more 'reciprocal', and this can be a temptation to turn over their security portfolios simply to create more commissions. In addition, the system is a major administrative headache. To satisfy hungry broker-dealers, a large fund may have to allocate its commission business to more than 300 brokers, and use indirect payoffs (e. g., underwritings) to take care of those not equipped to handle stock-exchange transactions."

161. 15 U.S.C.A. § 77a et seq.

162. 15 U.S.C.A. § 78a et seq.

163. 15 U.S.C.A. § 80a–1 et seq.

164. 15 U.S.C.A. § 41 et seq.

diction that would not otherwise obtain.[165]

■■ Violation of a federal statute may accord a private litigant a remedy by implication notwithstanding the absence of specific statutory authority conferring upon the injured the right to redress statutory wrongs, for the common law will supply a remedy where the statute is silent.[166] The intention to create civil liability is presumed unless a contrary legislative intent is to be inferred from the whole purview of the Act.[167] Section 286 of the Restatement of the Law of Torts, Vol. 2, p. 752 provides:

"The violation of a legislative enactment by doing a prohibited act, or by failing to do a required act, makes the actor liable for an invasion of an interest of another if:

"(a) the intent of the enactment is exclusively or in part to protect an interest of the other as an individual; and

"(b) the interest invaded is one which the enactment is intended to protect; and

"(c) where the enactment is intended to protect an interest from a particular hazard, the invasion, of the interest results from that hazard; and

"(d) the violation is a legal cause of the invasion, and the other has not so conducted himself as to disable himself from maintaining an action."

Plaintiffs rely on Section 17 of the Securities Act of 1933 which makes it unlawful (1) to employ any device, scheme or artifice to defraud, (2) to obtain money by means of an untrue statement of a material fact necessary to make the statements made not misleading, and (3), to engage in any transaction which would operate as a fraud or deceit upon the purchaser.[168] Section 10 of the 1934 Act,[169] interdicts the use in connection with the sale of any security, any manipulative or deceptive device in contravention of rules promulgated by the Commission. Rule X–10B–5 declares unlawful the acts proscribed by Section 17 of the Securities Act of 1933.[170]

Plaintiffs assert in order for the literature of Wellington Fund and Wellington Equity Fund not to be materially false, deceptive and misleading, the literature including the prospectuses of the Funds, should set forth defendants' contentions that,

"The name 'Wellington' and the goodwill which it symbolizes relate to and are the result of the activities of the investment manager and sponsor and thus belong to the investment manager and sponsor." [171]

Section 35(d) of the Investment Company Act provides: [172]

"It shall be unlawful for any registered investment company hereafter to adopt as a part of the name or title of such company, or of any security of which it is the issuer, any word or words which the Commission finds and by order declares to be deceptive or misleading. * * *"

Defendants suggest plaintiffs do not have standing to assert the alleged violation of the aforementioned statutes.

165. Defendants acquiesce in this conclusion:
" * * * It is probably safe to say that the Federal Counts in this case are not 'clearly immaterial' and were not made solely for the purpose of obtaining jurisdiction. * * *" Def.Br. On The Alleged Violation of the Federal Statutes, pp. 2–3.

166. Bell v. Hood, 1946, 327 U.S. 678, 684, 66 S.Ct. 773, 90 L.Ed. 939. Restatement of the Law of Torts, Vol. 2, § 286.

167. Narramore v. Cleveland, C., C. & St. L. R. Co., 6 Cir., 1899, 96 F. 298, 300.

168. 15 U.S.C.A. § 77q.

169. 15 U.S.C.A. § 78j.

170. 17 CFR 240.10b–5.

171. Def.Br. p. 2.

172. 15 U.S.C.A. § 80a–34(d).

With respect to the Securities Act of 1933 defendants state:

"That these provisions of the 1933 Act were enacted to protect investors needs no discussion. Wellington Fund is not an investor in Wellington Equity Fund. Thus, even if the use of the 'Wellington' name by Wellington Equity Fund were a violation of the rights of Wellington Fund and if the latter's registration statement and prospectus were thereby made misleading, fraudulent and deceptive, the interest which Plaintiffs seek to assert here on behalf of Wellington Fund is not an interest which the statute was intended to protect."[173]

Defendants similarly observe in connection with the purported violation of the 1934 Act, that:

"The situation here is almost identical with that under the 1933 Act. Wellington Fund's alleged interest in its name is not an interest which the 1934 Act was designed to protect and it is not among the persons which that Act was intended to protect. The Slavin case [Slavin v. Germantown Fire Ins. Co., 174 F.2d 799 (3 Cir. 1949)] involved these provisions of the 1934 Act and of Rule X-10B-5 and the opinion is therefore equally applicable here."[174]

In addition to lack of standing, defendants submit no action can be maintained under the Investment Company Act of 1940, because Section 35 specifically reposes with the Commission, in the event the Commission should find that a name or title is deceptive or misleading, authority to bring an appropriate action to enjoin the use of a deceptive or misleading name.[175] Thus, defendants assert:

" * * * As far as the statute is concerned, the determination is that of the Commission initially * * *, and it is given the right to maintain any necessary court proceedings. No private remedy can be implied from these explicit provisions lodging the right to act in the Commission.

"Further, it is quite clear that this provision of the Investment Company Act was intended to protect investors and not to provide a remedy for the protection of the alleged property right of another in the word or words being used."[176]

The Securities and Exchange Commission has been entrusted by Congress with administering the Securities Acts of 1933 and 1934 and the Investment Company Act of 1940. Prior to the institution of the declaratory judgment action the Commission had been apprised of the serious matters raised by plaintiffs.[177] Shortly after commencement of the action, plaintiffs forwarded to the Commission a copy of the present complaint.[178] The Court at the pre-trial conference, May 22, 1959, inquired why the Commission did not elect to participate in the proceedings.[179] Counsel for defendants replied to the Court as follows:[180]

"We have invited them to come down and testify, give their views, but we ran into the thing you so often run into with an administrative agency, that they want to let what has happened speak for itself. The matter was presented to them and they did nothing about it. They don't want to come down. I think it is probably the fact that the Commission as such has not picked up the problem and drafted rules and regulations that this is going to be done. They are aware of it, it has been going on; they have said nothing about the statutes, and under the

---

173. Def.Br. On The Alleged Violation of the Federal Statutes, p. 6.

174. Id. at p. 8.

175. 15 U.S.C.A. § 80a-34.

176. Def.Br. On The Alleged Violations of the Federal Statutes, p. 9.

177. N.T. 434-437.

178. DX 20.

179. Transcript of Pre-trial Proceedings, May 22, 1959, pp. 93-94.

180. Id. at p. 95.

rules and regulations, whatever you draw from that they say you draw it."

It is one thing to say that the three statutes in question were drafted with the overall intent to protect the investing public but something quite different to conclude a competitor has no standing to prosecute a violation of these enactments. Clearly, the Commission would have been justified to launch an investigation into the alleged improper practices on the complaint of plaintiffs. In Branch v. Federal Trade Commission,[181] the Court in construing the Federal Trade Commission Act interpreted the term "public" to include "competitor". Retired Mr. Justice Minton then writing for the Seventh Circuit observed:[182]

" * * * The evidence here shows that there are some fifty or more correspondence schools in this country using correspondence methods to carry on their business. At least a few of these schools were engaged in competition with the petitioner for the business in the Latin-American field. The action of the Federal Trade Commission was aimed at compelling the petitioner to use fair methods in competing with his fellow countrymen. * * * It has been held many times that the public has an interest in preventing false and fraudulent conduct under such circumstances. * * * "

In the present context, federal statutory remedies accorded by implication must be held to extend to persons other than the investing public in certain compelling instances. To begin with, in particular circumstances the investors' interest is peculiarly served by according remedial rights by implication to persons other than investors. The administrative agency exercising appropriate discretion may decide not to institute the required action to protect the injured litigants' interests. Further, there may be no remedy conferred by State law, or in the case of an enterprise engaged in multi-state activities, local relief may be entirely inadequate.[183] The crux of the matter is, plaintiffs are not acting as private attorneys general, or as a special representative of the Commission. Plaintiffs are in Court in an attempt to vindicate the rights and protections which they claim are secured to Wellington Fund by virtue of federal law.

The Fifth Circuit's recent decision in Hooper v. Mountain States Securities Corp.[184] is peculiarly appropriate. The Court accepted jurisdiction over an action initiated by a corporation alleging that it had been defrauded in the issuance of its stock. There, as in the present controversy, jurisdiction was invoked pursuant to Section 10(b) [185] of the Securities Exchange Act and under Commission Rule X-10B-5. In sustaining the corporation's right to maintain a private action against defendants' con-

181. 7 Cir., 1944, 141 F.2d 31.

182. Id. at page 34.

183. " * * * A significant purpose of X-10B-5 was to extend to sellers the same protection against fraudulent and other unlawful schemes afforded to those defrauded in the purchase of securities. In a substantive way it is even more sweeping. It greatly expands the protection frequently so hemmed in by the traditional concepts of common law misrepresentation and deceit, the requirement of privity, proof of specific damage, inadequacy of the right of rescission or right to recover up to par value of stock of a much greater market value. *To these difficulties would have to be*

*added the geographic obstacle of suit in a common forum against multistate defendants scattered as far as the fraudulent device required.* And along with the Second, Third and Ninth Circuits, we now adopt, as we earlier foreshadowed, the principles set forth in the trail-blazer decision of Kardon v. National Gypsum Co., D.C.E.D.Pa.1946, 69 F.Supp. 512, that a violation of rule 10B-5 gives rise to a private right of action. * * * " Hooper v. Mountain States Securities Corp. et al., 5 Cir., 1960, 282 F.2d 195. (Emphasis supplied.)

184. 1960, 282 F.2d 195.

185. 15 U.S.C.A. § 78j(b).

220

tention that plaintiff lacked standing, the Court commented:

"* * * Quite obviously the broad purpose of this legislation was to keep the channels of interstate commerce, the mail, and national security exchanges pure from fraudulent schemes, tricks, devices, and all forms of manipulation. Just as obviously those sought to be protected were the very persons who would be engaged in buying and selling and trading in corporate securities as broadly defined in the Act. Certainly a person who parts with stock owned by him as the result of fraudulent practices wrought on him by his purchaser sustains an adverse impact that differentiates him from the damage suffered by the public generally. It is not essential, therefore, that for an issuing corporation to come under § 10(b) and Rule X–10B–5 it have the status of an 'investor' as such." [186]

The Court concludes plaintiffs have standing to prosecute the present federal causes of action.

There is no need to rule substantively on the federal causes, for under the analysis of Bell v. Hood,[187] judgment of the common law claims must be on the merits once jurisdiction has been reposed by virtue of a claim not frivolous or sham, predicated upon the Constitution or laws of the United States, notwithstanding the lack of merit of the federal claims. Since the common law causes of action accord plaintiffs complete vindication of the

derivative rights they assert, orderly judicial process requires that the Court abstain from ruling on the substance of the admittedly novel federal claims until a more propitious occasion, where, perhaps, the adjudicating tribunal will be in a better position to enlist the assistance of an administrative agency's expertise or, at least, until the law in this area has crystallized.

Counsel for defendants and counsel for plaintiffs join this Court in its conclusion that the doctrine of pendent jurisdiction obtains, and that the Court is thus cloaked with the requisite authority to decide the substantive issues posed by the common law claims. The following observation of counsel for defendants is relevant:

"There is no question but that Plaintiffs assert a single cause of action and seek recovery at Common Law and under the Federal Statutes. Although the claims under the Federal Statutes are not legally supportable, the theory of pendent jurisdiction would seem to support the Court's jurisdiction over the Common Law basis for the cause of action." [188]

The Court recognizes the potential impact this determination might have with respect to expanding federal jurisdiction, namely, that there may now be federal cognizance of unfair competition claims if one of the parties in some respect is regulated by a federal statute or administrative body.[189] With respect to regulated investment companies, na-

186. Note 184, supra.

187. 1946, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939; see also 1 Moore's Fed. Prac. ¶ 0.60 [8.–3] p. 631.

188. Def.Br. On The Alleged Violations of the Federal Statutes, p. 13.

189. "* * * As I have pointed out above, we necessarily have now at least a partial federal law of unfair competition; we so much need a complete and uniform law to supplement and round out the existing federal law of trade-mark infringement that we should be astute to avoid

this confusing fragmentation of decision wherever we reasonably can." Concurring opinion Judge Clark, Maternally Yours v. Your Maternity Shop, 2 Cir., 1956, 234 F.2d 538, 546–547; see also Pagliero v. Wallace China Co., 9 Cir., 1952, 198 F.2d 339; Stauffer v. Exley, 9 Cir., 1950, 184 F.2d 962; contra, American Auto Ass'n. v. Spiegel, 2 Cir., 1953, 205 F.2d 771, certiorari denied 1953, 346 U.S. 887, 74 S.Ct. 138, 98 L.Ed. 391; cf. approach of Judge Hastie in L'Aiglon Apparel v. Lana Lobell, Inc., 3 Cir., 1954, 214 F.2d 649.

tional in scope, perhaps, this result would be salutary.[190]

### Relief

Many factors must be considered in fashioning an appropriate decree. The principal impact of an injunction will be borne by innocent victims—the shareholders of Wellington Equity Fund. This controversy should have been determined before Wellington Equity Fund was launched. Although plaintiffs made their position known to defendants prior to the public offering of Wellington Equity Fund shares, defendants deemed it unwise to curtail their efforts at that time.[191] The Securities and Exchange Commission remained silent, notwithstanding plaintiffs' protestations to it.[192] Perhaps the Commission should take a more active role in the affairs of investment companies because the investing public, composed of many persons unskilled in the investing arts,[193] is entitled to protection.

Wellington Equity Fund has now been in existence for almost two years. Its shares are widely distributed and are held by investors representing all aspects of the investing public.

The main theme in formulating a decree has been an attempt to assuage the ultimate impact upon Wellington Equity Fund's shareholders without sacrificing the rights of Wellington Fund. After a careful evaluation of the competing interests the Court has determined that Wellington Equity Fund must cease using the name "Wellington" as its corporate trade name. Anything less would not accord Wellington Fund the minimum it is entitled. To deprive Wellington Equity Fund of the use of the name "Wellington" at this early stage in its existence might, in the long run, redound to its benefit. As noted, the Certificate of Incorporation of the Wellington Equity Fund provides:

" * * * [T]hat if at any time * * * The Wellington Company * * * ceases to be the investment advisor of the Corporation * * * and national distributor of its shares, it shall at the written request of * * * The Wellington Company * * * change its name so that no reference therein shall be contained to 'Wellington', 'Morgan', 'Claymont' or 'Locust Street'."[194]

In view of this provision, in contemplating whether to renew its investment advisory and underwriting contracts, there is this extraneous pressure, which is not conducive to fostering an objective approach in the light of the spirit of the Investment Company Act of 1940.[195] Perhaps, it is advantageous to Wellington Equity Fund that its shareholders, many of whom are unsophisticated investors, be apprised of this crucial matter so that in adopting a new name, the shareholders will be able to make an intelligent selection, absent any reservation or acknowledgement that the name adopted belongs to someone else.

An injunction will issue enjoining Wellington Equity Fund, Wellington Company and Wellington, Ltd. from employing the name "Wellington" in the investment company field.

### Damages

Plaintiffs, in addition to injunctive relief, seek damages.

 Other than requiring Wellington Company and Wellington, Ltd. to bear the costs of the litigation and to pay plaintiffs a reasonable allowance for their attorneys, no item of damage is justified.[196]

The traditional forms of monetary recovery, in addition to costs, assessed

---

190. Note 195, infra; 1 Moore's Fed.Prac. ¶¶ 0.60 [8.–7], 0.326.

191. See letter attachments to Complaint.

192. DX 20.

193. N.T. 163–164.

194. Stipulated Fact No. 7.

195. See note 76, supra, and accompanying text.

196. Cf. National Van Lines v. Dean, 9 Cir., 1956, 237 F.2d 688, 694; Youthform Company v. R. H. Macy & Co., D.C.N.D.Ga.1957, 153 F.Supp. 87, 95, 96.

against the perpetrators of the unfair competition are damages and profits (including unjust enrichment).[197] Damages will normally include injury to the plaintiff's reputation and goodwill; expenses such as advertising or change of name, incurred in order to differentiate his product from that of the wrongdoer; and reduced profits due to fewer sales or sales at lowered prices.[198] The record is barren of facts tending to establish any monetary damages suffered by Wellington Fund by reason of the existence of Wellington Equity Fund.

Profits, similarly cannot be considered a suitable measure to assess against defendants. There is no question Wellington Equity Fund's underwriting was enhanced by having the name "Wellington". It is, however, impossible to measure the amount of the enrichment. Any assessment based upon this item would be the product of rank speculation.

The principal harm to Wellington Fund engendered by Wellington Equity Fund using the name "Wellington" is the preclusion of Wellington Fund from ever effectively entering the stock fund field and certain attendant conflicts of interest. "Wellington Fund" having been an investment company since 1928, and having employed the trade name "Wellington Fund" since 1935, is entitled to the

exclusive use of its name in the field. An injunction makes this possible.[199] Other injuries Wellington Fund has suffered or to which it is presently exposed —the limited competition offered by Wellington Equity Fund and the potential harm to Wellington Fund in the event Wellington Equity Fund should somehow create an unfavorable public image—are likewise remedied by injunctive relief.

Damages and profits need not be the invariable result of a finding of unfair competition.[200] As this Court observed in Old Charter Distillery Co. v. Continental Distilling Corp.: "The relief an injured litigant is entitled after establishing affirmatively validity, priority and likelihood of confusion, depends upon a careful evaluation of the equities and competing interests." [201]

### Attorney's Fees

 Before attorney's fees can be assessed as an element of damage against the perpetrators of the unfair competition, the Court is required to find the wrongdoers' actions were unconscionable,[202] fraudulent,[203] willful,[204] in bad faith,[205] vexatious,[206] or exceptional.[207] Absent a statutory provision, an equity court is not deprived of its inherent power to award attorney's fees to the prevail-

197. " * * * Section 35 of the Lanham Act [15 U.S.C.A. § 1117], which provides that a plaintiff shall be entitled to recover damages, profits, and costs, subject to the principles of equity, seems to preserve in large part the prior case law on monetary relief in cases involving infringement of registered marks." Developments in the Law, Trade-Marks and Unfair Competition, 68 Harv.L.Rev. 814, 864 (1955).

198. Ibid. Fancee Free Mfg. Co. v. Fancy Free Fashions, D.C.S.D.N.Y.1957, 148 F.Supp. 825, 831.

199. As far as can be determined only injunctive relief was awarded by the Court in Standard Brands v. Smidler, D.C.E.D. N.Y.1944, 56 F.Supp. 665, affirmed 2 Cir., 1945, 151 F.2d 34.

200. Admiral Corp. v. Penco, Inc., 2 Cir., 1953, 203 F.2d 517.

201. D.C.D.Del.1959, 174 F.Supp. 312, 325.

202. Singer Mfg. Co. v. Singer Upholstering & Sewing Co., D.C.W.D.Pa.1955, 130 F. Supp. 205, 208.

203. Maternally Yours v. Your Maternity Shop, 2 Cir., 1956, 234 F.2d 538, 545; Fancee Free Mfg. Co. v. Fancy Free Fashions, D.C.S.D.N.Y.1957, 148 F.Supp. 825, 831.

204. National Van Lines v. Dean, 9 Cir., 1956, 237 F.2d 688, 694.

205. Williamson-Dickie Mfg. Co. v. Davis Mfg. Co., D.C.E.D.Pa.1957, 149 F.Supp. 852, 855.

206. Ibid.

207. Apple Growers Association v. Pelletti Fruit Company, D.C.N.D.Cal.1957, 153 F. Supp. 948, 952; Riverbank Laboratories v. Hardwood Products Corp., D.C.N.D. Ill.1958, 165 F.Supp. 747, 765.

ing party where the circumstances warrant.[208]

■■■■■ In the present action, certain minority shareholders asserted derivative rights. They have succeeded in preserving for their corporation the exclusive use of the corporate name in the investment company field. The law allows stockholders who successfully maintain a suit, wherein the corporation's property or legal rights obtain protection, reimbursement for their attorney's fees in prosecuting the action.[209] Counsel for plaintiffs are thus entitled to compensation for their efforts in the successful conduct of this suit. The question remains against which defendants should the fees be assessed and in what amount.

Wellington Fund, although a nominal defendant, is in effect the real plaintiff because of the peculiar nature of a stockholder's derivative suit. If Wellington Fund had prosecuted the action in its own right, the traditional considerations would pertain in determining whether as an element of compensatory damages [210] or costs, Wellington Fund would be entitled to counsel fees. A careful examination of the record demonstrates that counsel for plaintiffs deserve to be reasonably compensated for their services by defendants, Wellington Company and Wellington, Ltd.

Walter L. Morgan is undeniably the dominant figure in this narrative. He is president and director of each of the defendants. In addition, with respect to defendant Wellington Company, he is the beneficial and record holder of the common stock and substantially all of the preferred stock.[211] He is also beneficial and record holder of substantially all of the outstanding common stock of defendant Wellington, Ltd. and together with members of his family owns a majority of its preferred stock.[212]

■■■■■ In this litigation, Mr. Morgan chose to align himself with the corporations which are, in effect, his alter ego. There would have been no occasion for the present suit if Mr. Morgan had not decided to employ the Wellington symbol as the name of the new Fund. His actions cannot be endorsed by virtue of the industry wide practice forming the basis of his decision to proceed as he did. That he acted on the respected opinion of experienced counsel is not a factor entitling him to complete exoneration. Wellington Fund had every right to protect its interest in the "Wellington" name. The Morgan position, that Wellington Company owns the contested name, was acquiesced in by the directors of Wellington Fund, consequently, it was only by virtue of assertion of derivative rights that Wellington Fund was able to achieve the protection afforded by this Court. It would be unconscionable for Wellington Fund to be saddled with plaintiffs' attorney's fees in view of the conduct of its president and directors. Similarly, to assess part of these expenses against the innocent shareholders of Wellington Equity Fund would not be in keeping with equitable principles. Wellington Equity Fund had every right to assume that the purported consensual right to use the name, included in its Articles of Incorporation, was valid.[213] Accordingly, Wellington Equity Fund will not be required to pay any portion of the fees of plaintiffs' counsel.

Defendants, Wellington Company and Wellington, Ltd. are the proper defendants to bear these costs. They stood the most to gain by conferring on Wellington Equity Fund the purported right to use the "Wellington" name. Exceptional circumstances appear in the present record to warrant the imposition of plaintiffs' attorney's fees against the designated defendants.

208. Notes 202–207, supra.

209. See 107 A.L.R. 760–761; 49 A.L.R. 1190–1196.

210. Youthform Co. v. R. H. Macy & Co., D.C.N.D.Ga.1957, 153 F.Supp. 87, 95.

211. Stipulated Fact No. 6.

212. Stipulated Fact No. 8.

213. Note 194, supra.

After an appropriate application and hearing, plaintiffs will be awarded reasonable counsel fees.

### Costs

Costs will be assessed against defendants, Wellington Company and Wellington, Ltd. for the aforementioned reasons.

The foregoing opinion is adopted as the Court's findings of fact and conclusions of law pursuant to F.R.Civ.P. 52(a), 28 U.S.C.A.

Let an appropriate order in conformity herewith be submitted.